# UNITED STATES *v.* GRIMAUD.

# SAME *v.* INDA.

**ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF CALIFORNIA.**

Nos. 241, 242.   Argued February 28, 1910; affirmed by divided court March 14, 1910; restored to docket for reargument April 18, 1910; reargued March 3, 1911.—Decided May 3, 1911.

Under the acts establishing forest reservations, their use for grazing or other lawful purposes is subject to rules and regulations established by the Secretary of Agriculture, and it being impracticable for Congress to provide general regulations, that body acted within its constitutional power in conferring power on the Secretary to establish such rules; the power so conferred being administrative and not legislative, is not an unconstitutional delegation.

While it is difficult to define the line which separates legislative power to make laws and administrative authority to make regulations, Congress may delegate power to fill up details where it has indicated its will in the statute, and it may make violations of such regulations punishable as indicated in the statute; and so *held*, that regulations made by the Secretary of Agriculture as to grazing sheep on forest reserves have the force of law and that violations thereof are punishable, under act of June 4, 1897, c. 2, 30 Stat. 35, as prescribed in § 5388, Rev. Stat.

Congress cannot delegate legislative power, *Field* v. *Clark*, 143 U. S. 692, but the authority to make administrative rules is not a delegation of legislative power, and such rules do not become legislation because violations thereof are punished as public offenses.

Even if there is no express act of Congress making it unlawful to graze sheep or cattle on a forest reserve, when Congress expressly provides that such reserves can only be used for lawful purposes subject to regulations and makes a violation of such regulations an offense, any existing implied license to graze is curtailed and qualified by Congress; and one violating the regulations when promulgated makes an unlawful use of the Government's property and becomes subject to the penalty imposed.

A provision in an act of Congress as to the use made of moneys received from government property clearly indicates an authority to the executive officer authorized by statute to make regulations regarding the property to impose a charge for its use.

Where the penalty for violations of regulations to be made by an executive officer is prescribed by statute, the violation is not made a crime by such officer but by Congress, and Congress and not such officer fixes the penalty, nor is the offense against such officer but against the United States.

170 Fed. Rep. 205, reversed.

By the act of March 3, 1891, c. 561 (26 Stat. 1103), the President was authorized, from time to time, to set apart and reserve, in any State or Territory, public lands, wholly or in part covered with timber or undergrowth, whether of commercial value or not, as public forest reservations.   And by the act of June 4, 1897, c. 2 (30 Stat. 35), the purposes of these reservations were declared to be "to improve and protect the forest within the reservation, and to secure favorable conditions of water flows, and to furnish a continuous supply of timber for the use and necessities of citizens of the United States."   . . . "All waters on such reservations may be used for domestic, mining, milling or irrigation purposes, under the laws of the State wherein such forest reservations are situated, or under the laws of the United States and the rules and regulations established thereunder."   (30 Stat. 36.)

It is also provided that nothing in the act should "be construed as prohibiting the egress and ingress of actual settlers residing within the boundaries of such reservations, . . . nor shall anything herein . . . prohibit any person from entering upon such forest reservation for all proper and lawful purposes, . . . provided that such persons comply with the rules and regulations covering such forest reservation."

There were special provisions as to the sale of timber from any reserve (except those in the State of California, 30 Stat. 35, c. 2; 31 Stat. 661, c. 804), and a requirement

that the proceeds thereof and from any other forest source should be covered into the Treasury, the act of February 1, 1905, 33 Stat. 628, c. 288, providing that "all money received from the sale of any products or the use of any land or resources of said forest reserve shall be covered into the Treasury of the United States for a period of five years from the passage of this act, and shall constitute a special fund available, until expended, as the Secretary of Agriculture may direct, for the protection, administration, improvement and extension of Federal Forest Reserves."

The act of 1905 as to receipts arising from the sale of any products or the use of any land was, in some respects, modified by the act of March 4, 1907, c. 2907, 34 Stat. 1256, 1270. It provided that all moneys received after July 1, 1907, by or on account of forest service timber; or from any other source of forest reservation revenue, shall be covered into the Treasury, "provided that ten per cent of all money received from each forest reserve during any fiscal year, including the year ending June 30, 1906, shall be paid at the end thereof by the Secretary of the Treasury to the State or Territory in which said reserve is situated, to be expended as the State or Territorial legislature may prescribe for the benefit of the public schools and public roads in the county or counties in which the forest reserve is situated."

The jurisdiction, both civil and criminal, over persons within such reservation was not to be affected by the establishment thereof "except so far as the punishment of offenses against the United States therein is concerned; the intent being that the State shall not by reason of the establishment of the reserve lose its jurisdiction, nor the inhabitants thereof their rights and privileges as citizens, or be absolved from their duty as citizens of the State."

The original act provided that the management and regulation of these reserves should be by the Secretary

of the Interior, but in 1905 that power was conferred upon the Secretary of Agriculture, (33 Stat. L. 628), and by virtue of those various statutes he was authorized to "make provision for the protection against destruction by fire and depredations upon the public forests and forest reservations . . . ; and he may make such rules and regulations and establish such service as will insure the objects of such reservation, namely, to regulate their occupancy and use, and to preserve the forests thereon from destruction; and any violation of the provisions of this act or such rules and regulations shall be punished as prescribed in Rev. Stat.; § 5388," which, as amended, provides for a fine of not more than five hundred dollars and imprisonment for not more than twelve months or both, at the discretion of the court. 26 Stat., 1103, c. 561; 30 Stat. 34; c., 235; 31 Stat: 661, c. 804; 33 Stat. 36; 7 Fed. Stat. Anno. §§ 310–317, 296, Supp. 1909, p. 634.

Under these acts the Secretary of Agriculture, on June 12, 1906, promulgated and established certain rules for the purpose of regulating the use and occupancy of the public forest reservations and preserving the forests thereon from destruction, and among those established was the following:

"Regulation 45. All persons must secure permits before grazing any stock in a forest reserve, except the few head in actual use by prospectors, campers and travelers and milch or work animals, not exceeding a total of six head, owned by *bona fide* settlers residing in or near a forest reserve, which are excepted and require no permit."

The defendants were charged with driving and grazing sheep on a reserve, without a permit. The grand jury in the District Court for the Southern District of California, at the November term, 1907, indicted Pierre Grimaud and J. P. Carajous, charging that on April 26, 1907, after the Sierra Forest Reserve had been estab-

lished, and after regulation 45 had been promulgated, "they did knowingly, wilfully and unlawfully pasture and graze and cause and procure to be pastured and grazed certain sheep (the exact number being to the grand jurors unknown) upon certain land within the limits of and a part of said Sierra Forest Reserve, without having theretofore or at any time secured or obtained a permit or any permission for said pasturing or grazing of said sheep or any part of them, as required by the said rules and regulations of the Secretary of Agriculture," the said sheep not being within any of the excepted classes. The indictment concluded, "contrary to the form of the statutes of the United States in such case made and provided, and against the peace and dignity of the said United States."

The defendants demurred, upon the ground (1) that the facts stated did not constitute a public offense, or a public offense against the United States, and (2) that the acts of Congress making it an offense to violate rules and regulations made and promulgated by the Secretary of Agriculture are unconstitutional, in that they are an attempt by Congress to delegate its legislative power to an administrative officer." The court sustained the demurrers, (170 Fed. Rep. 205), and made a like ruling on the similar indictment in *United States* v. *Inda,* 216 U. S. 614. Both judgments were affirmed by a divided court. Afterwards petitions for rehearing were granted.

*Mr. Assistant Attorney General Fowler,* with whom *Mr. Loring C. Christie* was on the brief, for the United States. *Mr. Solicitor General Bowers* on the original argument:

Congress has power to enact legislation for the protection of its public lands, and, if it deems advisable, to enact criminal laws to prevent trespasses thereon. *Camfield* v. *United States,* 167 U. S. 518, 525.

A violation of the regulations prescribed by the Secretary of Agriculture upon which, and the statute authorizing them, this indictment is based, constitutes an offense, and renders the offender liable to punishment in accordance with the terms of the statute. *United States* v. *Bailey,* 9 Pet. 238, 252, 254, 256.

A certain act upon the part of a person becomes a criminal offense in consequence and by virtue of a regulation adopted by the executive officer where such officer's action in adopting such regulation is essential to the existence of the offense. *Caha* v. *United States,* 152 U. S. 211, 218; *United States* v. *Eaton,* 144 U. S. 677, distinguished; and see *In re Kollock,* 165 U. S. 526; *United States* v. *Breen,* 40 Fed. Rep. 402; *St. Louis & Iron Mt. Ry. Co.* v. *Taylor,* 210 U. S. 281.

The act of Congress under which the Secretary of Agriculture promulgated the regulation in question did not involve an improper attempt to delegate legislative power to an administrative officer. *Brown* v. *Turner,* 70 N. Car. 93, 102; *Union Bridge Co.* v. *United States,* 204 U. S. 364, 382; *Dastervignes Case,* 122 Fed. Rep. 30, 34; *West* v. *Hitchcock,* 205 U. S. 80; *Interstate Com. Comm.* v. *Chi., R. I. & P. R. R. Co.,* 218 U. S. 88; *Tilley* v. *Savannah &c. Ry. Co.,* 5 Fed. Rep. 641; *Chicago &c. Ry. Co.* v. *Dey,* 35 Fed. Rep. 866; *Interstate Com. Comm.* v. *Ill. Cent. R. R. Co.,* 215 U. S. 452; Willoughby on the Constitution, § 781.

The act was unlawful irrespective entirely of regulation 45 or of any other rule of the Department. It was an entry and trespass on the lands of the United States. *Camfield* v. *United States, supra; Buford* v. *Houtz,* 133 U. S. 320, 326, distinguished, and see *Wilcox* v. *McConnel,* 13 Pet. 496, 512. The Secretary did not attempt to make unlawful that which, but for such rules, would have been lawful, as in *United States* v. *Moody,* 164 Fed. Rep. 269.

Congress has a much more exclusive control over pub-

lic forest lands and reservations, and a much wider range of means in exercising it, than it has in respect to its more general functions under the Constitution. See as to other similar powers, *Oceanic Nav. Co.* v. *Stranahan*, 214 U. S. 320; *Ex parte Reed*, 100 U. S. 13; *Smith* v. *Whitney*, 116 U. S. 167; *Cosmos Co.* v. *Gray Eagle Co.*, 190 U. S. 301, 309; *Butte City Water Co.* v. *Baker*, 196 U. S. 119, 125.

The general theory of government that there should be no union between the several departments does not apply any more than it did in *Union Bridge Co.* v. *United States*, 204 U. S. 364, and *Oceanic Nav. Co.* v. *Stranahan*, *supra.*

The fact that the Secretary has the power to change the regulations in question, and has from time to time had in force regulations different in some respects to the present one, does not render the act of Congress invalid.

The Government's contention is sustained by the weight of authority among the lower United States courts. As to the validity of the Secretary's regulation for civil purposes see, *United States* v. *Shannon*, 151 Fed. Rep. 863; *S. C.*, 160 Fed. Rep. 870; *Dastervignes* v. *United States*, 122 Fed. Rep. 30; *United States* v. *Dastervignes*, 118 Fed. Rep. 199. The following have held indictment for violation of the regulation supportable: *United States* v. *Deguirro*, 152 Fed. Rep. 568; *United States* v. *Domingo*, 152 Fed. Rep. 566; *United States* v. *Bale*, 156 Fed. Rep. 687. On the other hand, the following held such an indictment bad: *United States* v. *Blasingame*, 116 Fed. Rep. 654; *United States* v. *Bale*, 156 Fed. Rep. 687; *United States* v. *Rizzinelli*, 182 Fed. Rep. 675; *Dent* v. *United States*, 8 Arizona, 413; *United States* v. *Reder*, 69 Fed. Rep. 965; *United States* v. *Williams*, 6 Montana, 379; *United States* v. *Trading Company*, 109 Fed. Rep. 239; *United States* v. *Ormsbee*, 74 Fed. Rep. 207; *United States* v. *Moody*, 164 Fed. Rep. 269; *Van Lear* v. *Eisle*, 126 Fed.

Rep. 823; *United States* v. *Slater,* 123 Fed. Rep. 115; *Stratton* v. *Oceanic Steamship Co.,* 140 Fed. Rep. 829.

As to other instances in which Congress has conferred upon executive officers equally broad powers to be exercised in administering the laws relating to public lands, see act of June 3, 1878, c. 150, 20 Stat. 88; act of June 3, 1878, c. 151, 20 Stat. 89; act of March 3, 1891, c. 561, as amended by the act of March 3, 1891, c. 559, 26 Stat. 1093; act of October 1, 1890, c. 1263, 26 Stat. 650; act of February 28, 1899, c. 221, 30 Stat. 908; § 2478, Rev. Stat.

A criminal indictment lies for transgression of the department regulation concerning stock grazing upon a forest reservation, 22 Ops. Atty. Gen. 266.

*Mr. J. M. Hodgson,* with whom *Mr. W. W. Kaye* and *Mr. Robert P. Stewart* were on the brief, for defendants in error:

The law is unconstitutional, as it does not sufficiently define, or define at all, what acts done or omitted to be done, within the supposed purview of the said act, shall constitute an offense or offenses against the United States. *State* v. *Mann,* 2 Oregon, 238, 241; *State* v. *Smith,* 30 La. Ann. 846; *United States* v. *Eaton,* 144 U. S. 677; *United States* v. *Grimaud,* 170 Fed. Rep. 206; *Cook* v. *State* (Ind.), 59 N. E. Rep. 489; *United States* v. *Reese,* 92 U. S. 214, 256; *Sarlls* v. *United States,* 152 U. S. 571; *Todd* v. *United States,* 158 U. S. 278; *Augustine* v. *State* (Tex.), 52 S. W. Rep. 80; *State* v. *Partlow,* 91 N. Car. 550; *McGuire* v. *Dist. of Col.,* 65 L. R. A. 430; *Tozer* v. *United States,* 52 Fed. Rep. 917; *Louisville & Nash. R. R. Co.* v. *Commonwealth* (Ky.), 33 L. R. A. 209; *Drake* v. *Drake,* 4 Dev. 110; *Commonwealth* v. *Bank,* 3 Watts & S. 173; 4 Blackstone's Comm. 5; 12 Cyc. 129; *Ex parte McNulty,* 77 California, 164; *Peters* v. *United States,* 36 C. C. A. 105.

The law under which the indictments were found is

unconstitutional, as it is not within the power of Congress to delegate to the Secretary of the Interior or the Secretary of Agriculture or any other person, authority or power to determine what acts shall be criminal; and the act in question is a delegation of legislative power to an executive officer to define and establish what shall constitute the essential elements of a crime against the United States. *United States* v. *Matthews,* 146 Rep. Fed. 306; *United States* v. *Maid,* 166 Fed. Rep. 650; *United States* v. *Blasingame,* 166 Fed. Rep. 654; *United States* v. *Eaton,* 144 U. S. 677; *United States* v. *Bridge Co.,* 45 Fed. Rep. 178; *United States* v. *Rider,* 50 Fed. Rep. 106; *O'Neil* v. *Am. Fire Ins. Co.,* 166 Pa. St. 72; *Adams* v. *Burdge,* 95 Wisconsin, 390; *Dowling* v. *Lancashire Ins. Co.,* 92 Wisconsin, 63; *Anderson* v. *Manchester Fire Ins. Co.,* 59 Minnesota, 182; *Ex parte Cox,* 63 California, 21; *Harbor Com'r* v. *Excelsior Redwood Co.,* 88 California, 491; *Schaezlein* v. *Cabaniss,* 135 California, 466; *Kilbourn* v. *Thompson,* 103 U. S. 168, 191; *United States* v. *Wiltberger,* 5 Wheat. 85.

MR. JUSTICE LAMAR, after making the foregoing statement, delivered the opinion of the court.

The defendants were indicted for grazing sheep on the Sierra Forest Reserve without having obtained the permission required by the regulations adopted by the Secretary of Agriculture. They demurred on the ground that the Forest Reserve Act of 1891 was unconstitutional, in so far as it delegated to the Secretary of Agriculture power to make rules and regulations and made a violation thereof a penal offense. Their several demurrers were sustained. The Government brought the case here under that clause of the Criminal Appeals Act, (March 2, 1907, c. 2564, 34 Stat. 1246,), which allows a writ of error where the "decision complained of was based upon the invalidity of the statute."

The Federal courts have been divided on the question as to whether violations of those regulations of the Secretary of Agriculture constitute a crime. The rules were held to be valid for civil purposes in *Dastervignes* v. *United States,* 122 Fed. Rep. 30; *United States* v. *Dastervignes,* 118 Fed. Rep. 199; *United States* v. *Shannon,* 151 Fed. Rep. 863; *S. C.,* 160 Fed. Rep. 870. They were also sustained in criminal prosecutions in *United States* v. *Deguirro,* 152 Fed. Rep. 568; *United States* v. *Domingo,* 152 Fed. Rep. 566; *United States* v. *Bale,* 156 Fed. Rep. 687; *United States* v. *Rizzinelli,* 182 Fed. Rep. 675. But the regulations were held to be invalid in *United States* v. *Blasingame,* 116 Fed. Rep. 654; *United States* v. *Matthews,* 146 Fed. Rep. 306; *Dent* v. *United States,* 8 Arizona, 138.

From the various acts relating to the establishment and management of forest reservations it appears that they were intended "to improve and protect the forest and to secure favorable conditions of water flows." It was declared that the acts should not be "construed to prohibit the egress and ingress of actual settlers" residing therein nor "to prohibit any person from entering the reservation for all proper and lawful purposes, including that of prospecting, and locating and developing mineral resources; provided that such persons comply with the rules and regulations covering such forest reservation." (Act of 1897, c. 2, 30 Stat. 36.) It was also declared that the Secretary "may make such rules and regulations and establish such service as will insure the objects of such reservation, namely, to regulate their occupancy and use and to preserve the forests thereon from destruction; *and any violation of the provisions of this act or such rules and regulations shall be punished*" as is provided in § 5388, c. 3, p. 1044 of the Revised Statutes, as amended.

Under these acts, therefore, any use of the reservation for grazing or other lawful purpose was required to be

subject to the rules and regulations established by the Secretary of Agriculture. To pasture sheep and cattle on the reservation, at will and without restraint, might interfere seriously with the accomplishment of the purposes for which they were established. But a limited and regulated use for pasturage might not be inconsistent with the object sought to be attained by the statute. The determination of such questions, however, was a matter of administrative detail. What might be harmless in one forest might be harmful to another. What might be injurious at one stage of timber growth, or at one season of the year, might not be so at another.

In the nature of things it was impracticable for Congress to provide general regulations for these various and varying details of management. Each reservation had its peculiar and special features; and in authorizing the Secretary of Agriculture to meet these local conditions Congress was merely conferring administrative functions upon an agent, and not delegating to him legislative power. The authority actually given was much less than what has been granted to municipalities by virtue of which they make by-laws, ordinances and regulations for the government of towns and cities. Such ordinances do not declare general rules with reference to rights of persons and property, nor do they create or regulate obligations and liabilities, nor declare what shall be crimes nor fix penalties therefor.

By whatever name they are called they refer to matters of local management and local police. *Brodbine* v. *Revere*, 182 Massachusetts, 598. They are "not of legislative character in the highest sense of the term; and as an owner may delegate to his principal agent the right to employ subordinates, giving them a limited discretion, so it would seem that Congress might rightfully entrust to the local legislature [authorities] the determination of minor matters." *Butte City Water Co.* v. *Baker*, 196 U. S. 126.

It must be admitted that it is difficult to define the line which separates legislative power to make laws, from administrative authority to make regulations. This difficulty has often been recognized, and was referred to by Chief Justice Marshall in *Wayman* v. *Southard,* 10 Wheat. 1, 42, where he was considering the authority of courts to make rules. He there said: "It will not be contended that Congress can delegate to the courts, or to any other tribunals, powers which are strictly and exclusively legislative. But Congress may certainly delegate to others, powers which the legislature may rightfully exercise itself." What were these non-legislative powers which Congress *could* exercise but which might also be delegated to others was not determined, for he said: "The line has not been exactly drawn which separates those important subjects, which *must* be entirely regulated by the legislature itself, from those of less interest, in which a general provision may be made, and power given to those who are to act under such general provisions to fill up the details."

From the beginning of the Government various acts have been passed conferring upon executive officers power to make rules and regulations—not for the government of their departments, but for administering the laws which did govern. None of these statutes could confer legislative power. But when Congress had legislated and indicated its will, it could give to those who were to act under such general provisions "power to fill up the details" by the establishment of administrative rules and regulations, the violation of which could be punished by fine or imprisonment fixed by Congress, or by penalties fixed by Congress or measured by the injury done.

Thus it is unlawful to charge unreasonable rates or to discriminate between shippers, and the Interstate Commerce Commission has been given authority to make reasonable rates and to administer the law against discrimination. *Int. Com. Comm.* v. *Ill. Cent. R. R.,* 215 U. S. 452;

*Int. Com. Comm.* v. *Chicago, Rock Island &c. R. R.*, 218 U. S. 88. Congress provided that after a given date only cars with drawbars of uniform height should be used in interstate commerce, and then constitutionally left to the Commission the administrative duty of fixing a uniform standard. *St. Louis & Iron Mountain R. R.* v. *Taylor,* 210 U. S. 281, 287. In *Union Bridge Co.* v. *United States,* 204 U. S. 364; *In re Kollock,* 165 U. S. 526; *Buttfield* v. *Stranahan,* 192 U. S. 470, it appeared from the statutes involved that Congress had either expressly or by necessary implication made it unlawful, if not criminal, to obstruct navigable streams; to sell unbranded oleomargarine; or to import unwholesome teas. With this unlawfulness as a predicate the executive officers were authorized to make rules and regulations appropriate to the several matters covered by the various acts. A violation of these rules was then made an offense punishable as prescribed by Congress. But in making these regulations the officers did not legislate. They did not go outside of the circle of that which the act itself had affirmatively required to be done, or treated as unlawful if done. But confining themselves within the field covered by the statute they could adopt regulations of the nature they had thus been generally authorized to make, in order to administer the law and carry the statute into effect.

The defendants rely on *United States* v. *Eaton,* 144 U. S. 677, where the act authorized the Commissioner to make rules for carrying the statute into effect, but imposed no penalty for failing to observe his regulations. Another section (5) required that the dealer should keep books showing certain facts, and providing that he should conduct his business under such surveillance of officers as the Commissioner might by regulation require. Another section declared that if any dealer should knowingly omit to do any of the things "required by law" he should pay a penalty of a thousand dollars. Eaton failed to keep the

books required by the regulations. But there was no charge
that he omitted " anything required by law," unless it could
be held that the books called for by the regulations were
"required by law." The court construed the act as a whole
and proceeded on the theory that while a violation of the
regulations might have been punished as an offense if Con-
gress had so enacted, it had, in fact, made no such pro-
vision so far as concerned the particular charge then under
consideration. Congress required the dealer to keep books
rendering return of materials and products, but imposed
no penalty for failing so to do. The Commissioner went
much further and required the dealer to keep books show-
ing oleomargarine received, from whom received and to
whom the same was sold. It was sought to punish the
defendant for failing to keep the books required by the
regulations. Manifestly this was putting the regulations
above the statute. The court showed that when Congress
enacted that a certain sort of book should be kept, the
Commissioner could not go further and require additional
books; or, if he did make such regulation, there was no pro-
vision in the statute by which a failure to comply therewith
could be punished. It said that, "if Congress intended to
make it an offense for wholesale dealers to omit to keep
books and render returns required by regulations of the
Commissioner, it would have done so distinctly"—imply-
ing that if it had done so distinctly the violation of the reg-
ulations would have been an offense.

But the very thing which was omitted in the Oleomar-
garine Act has been distinctly done in the Forest Reserve
Act, which, in terms, provides that "any violation of the
provisions of this act or such rules and regulations of the
Secretary shall be punished as prescribed in section 5388
of the Revised Statutes as amended."

In *Union Bridge Co.* v. *United States*, 204 U. S. 364,
386, Mr. Justice Harlan, speaking for the court, said:
"By the statute in question Congress declared in effect

that navigation should be freed from unreasonable obstructions arising from bridges of insufficient height, width of span or other defects. It stopped, however, with this declaration of a general rule and imposed upon the Secretary of War the duty of ascertaining what particular cases came within the rule prescribed by Congress, as well as the duty of enforcing the rule in such cases. In performing that duty the Secretary of War will only execute the clearly expressed will of Congress, and will not, in any true sense, exert legislative or judicial power."

And again he said in *Field* v. *Clark*, 143 U. S. 649, 694:

"The legislature cannot delegate its power to make a law, but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make its own action depend. To deny this would be to stop the wheels of government. There are many things upon which wise and useful legislation must depend which cannot be known to the lawmaking power, and must, therefore, be a subject of inquiry and determination outside of the halls of legislation." See also *Caha* v. *United States*, 152 U. S. 211; *United States* v. *Bailey*, 9 Pet. 238; *Cosmos Co.* v. *Gray Eagle Co.*, 190 U. S. 309; *Oceanic Navigation Co.* v. *Stranahan*, 214 U. S. 333; *Roughton* v. *Knight*, 219 U. S. 537 (Decided this Term); *Smith* v. *Whitney*, 116 U. S. 167; *Ex parte Reed*, 100 U. S. 22; *Gratiot* v. *United States*, 4 How. 81.

In *Brodbine* v. *Revere*, 182 Massachusetts, 598, a boulevard and park board was given authority to make rules and regulations for the control and government of the roadways under its care. It was there held that the provision in the act that breaches of the rules thus made should be breaches of the peace, punishable in any court having jurisdiction, was not a delegation of legislative power which was unconstitutional. The court called attention to the fact that the punishment was not fixed by the board, saying that the making of the rules was administrative, while

the substantive legislation was in the statute which pro-vided that they should be punished as breaches of the peace.

That "Congress cannot delegate legislative power to the President is a principle universally recognized as vital to the integrity and maintenance of the system of government ordained by the Constitution." *Field* v. *Clark,* 143 U. S. 649, 692. But the authority to make administrative rules is not a delegation of legislative power, nor are such rules raised from an administrative to a legislative character because the violation thereof is punished as a public offense.

It is true that there is no act of Congress which, in express terms, declares that it shall be unlawful to graze sheep on a forest reserve. But the statutes, from which we have quoted, declare, that the privilege of using reserves for "all proper and lawful purposes" is subject to the proviso that the person so using them shall comply "with the rules and regulations covering such forest reservation." The same act makes it an offense to violate those regulations, that is, to use them otherwise than in accordance with the rules established by the Secretary. Thus the implied license under which the United States had suffered its public domain to be used as a pasture for sheep and cattle, mentioned in *Buford* v. *Houtz,* 133 U. S. 326, was curtailed and qualified by Congress, to the extent that such privilege should not be exercised in contravention of the rules and regulations. *Wilcox* v. *Jackson,* 13 Pet. 498, 513.

If, after the passage of the act and the promulgation of the rule, the defendants drove and grazed their sheep upon the reserve, in violation of the regulations, they were making an unlawful use of the Government's property. In doing so they thereby made themselves liable to the penalty imposed by Congress.

It was argued that, even if the Secretary could establish regulations under which a permit was required, there was

nothing in the act to indicate that Congress had intended
or authorized him to charge for the privilege of grazing
sheep on the reserve. These fees were fixed to prevent ex-
cessive grazing and thereby protect the young growth, and
native grasses, from destruction, and to make a slight in-
come with which to meet the expenses of management.
In addition to the general power in the act of 1897, already
quoted, the act of February 1, 1905, c. 288, p. 628, clearly
indicates that the Secretary was authorized to make
charges out of which a revenue from forest resources was
expected to arise. For it declares that "all money received
from the sale of any products or the use of any land or re-
sources of said forest reserve" shall be covered into the
Treasury and be applied toward the payment of forest ex-
penses. This act was passed before the promulgation of
regulation 45, set out in the indictment.

Subsequent acts also provide that money received from
"any source of forest reservation revenue" should be
covered into the Treasury, and a part thereof was to be
turned over to the treasurers of the respective States to
be expended for the benefit of the public schools and pub-
lic roads in the counties in which the forest reserves are
situated. (C. 2907; 34 Stat. 684, 1270.)

The Secretary of Agriculture could not make rules and
regulations for any and every purpose. *Williamson* v.
*United States*, 207 U. S. 462. As to those here involved,
they all relate to matters clearly indicated and author-
ized by Congress. The subjects as to which the Secretary
can regulate are defined. The lands are set apart as a
forest reserve. He is required to make provision to protect
them from depredations and from harmful uses. He is
authorized "to regulate the occupancy and use and to pre-
serve the forests from destruction." A violation of reason-
able rules regulating the use and occupancy of the prop-
erty is made a crime, not by the Secretary, but by Con-
gress. The statute, not the Secretary, fixes the penalty.

The indictment charges, and the demurrer admits that Rule 45 was promulgated for the purpose of regulating the occupancy and use of the public forest reservation and preserving the forest. The Secretary did not exercise the legislative power of declaring the penalty or fixing the punishment for grazing sheep without a permit, but the punishment is imposed by the act itself. The offense is not against the Secretary, but, as the indictment properly concludes, "contrary to the laws of the United States and the peace and dignity thereof." The demurrers should have been overruled. The affirmances by a divided court heretofore entered are set aside and the judgments in both cases

*Reversed.*