[Crim. Nos. 1749, 1750. In Bank.—February 19, 1913.]

## In Re E. S. POTTER, on Habeas Corpus.

PHARMACY AND POISON ACTS IN PARI MATERIA—HARMONIOUS CONSTRUCTION—POWER OF PHARMACY BOARD TO MAKE REGULATIONS.—The so-called "Pharmacy Act" of 1905 (Stats. 1905, p. 535), as amended in 1909 (Stats. 1909, p. 1013), and the so-called "Poison Act" of 1907 (Stats. 1907, p. 124), as subsequently amended (Stats. 1909, p. 422; 1911, p. 1106), are *in pari materia,* dealing in many particulars with the same subject matter, and are to be construed and harmonized, if possible. So construed, the power is expressly conferred upon the board of pharmacy to promulgate "regulations not inconsistent with the laws of this state as may be necessary for the protection of the public" in the sale of poisons.

ID.—REGULATIONS MUST NOT BE INCONSISTENT WITH LAWS.—The power of the board in that respect is limited to the adoption of such regulations as are not "inconsistent with the laws of this state."

ID.—GROCERS AUTHORIZED TO SELL CERTAIN POISONOUS PREPARATIONS IN ORIGINAL PACKAGES—PHARMACY BOARD CANNOT DESTROY RIGHT TO SELL.—Section 16 of the so-called Pharmacy Act as amended in 1909, expressly authorizes the sale by grocers and dealers generally of certain enumerated articles containing arsenic and other poisons, "when prepared and sold only in original and unbroken packages and labeled with the official poison labels," and the pharmacy board has no power to enact a regulation which would, in

effect, deprive grocers of their right to sell any ant poison which might be an arsenical compound, and to limit the right of sale of such poisons to regular licensed pharmacists.

ID.—DELEGATION BY LEGISLATURE OF POWER TO MAKE REGULATIONS.— The legislature has power to delegate to proper authority the making of suitable rules and regulations for the conduct and transaction of any branch of the business of the state, and to declare a violation of those rules a penal offense.

ID.—CONSTITUTIONALITY OF POISON ACT.—The so-called Poison Act of March 6, 1907, is constitutional.

ID.—AMENDMENT OF 1911 TO POISON ACT—PHARMACY ACT NOT RE-PEALED.—The amendment of 1911 to the Poison Act, by the provision regulating the vending of opium and its derivatives, cocaine, chloral hydrate, and other like drugs and poisons, did not have the effect to re-enact the Poison Act as of the date of the amendment, and thus to repeal by implication the authority in the Pharmacy Act for the sale of certain poisons by grocers.

APPLICATION for a Writ of Habeas Corpus directed to the Chief of Police of the City of Los Angeles.

The facts are stated in the opinion of the court.

Parker & Moote, for Petitioner.

John D. Fredericks, District Attorney, Guy Eddie, City Prosecutor, Frank W. Stafford, Assistant City Prosecutor, and L. H. Roseberry, Special Prosecutor, for Respondent.

HENSHAW, J.—Petitioner is held under arrest by virtue of two criminal complaints, the one charging him with a violation of the so-called "Poison Act," the other with a violation of a resolution and regulation prescribed by the state board of pharmacy under and by virtue of certain provisions of the Poison Act. The legal questions presented under the two applications are intimately related and may be considered together.

The so-called "Poison Act" is "An act to regulate the sale of poisons in the state of California and providing a penalty for the violation thereof." It was approved March 6, 1907. (Stats. 1907, p. 124.) It has been amended in 1909 (Stats. 1909, p. 422), and again in 1911 (Stats. 1911, p. 1106). But these amendments do not affect the original act as to any of

the legal questions herein to be considered. The Poison Act enumerated many poisonous, deleterious and injurious drugs and other substances in a list called "schedule A." It regulated the sales of the articles in schedule A, and in section 4 provided:

"When in the opinion of the state board of pharmacy, it is in the interest of the public health, they are hereby empowered to further restrict, or prohibit the retail sale of any poison by rules not inconsistent with the provisions of this act, by them to be adopted, and which rules must be applicable to all persons alike. It shall be the duty of the board, upon request, to furnish any dealer with a list of all articles, preparations and compounds, the sale of which is prohibited or regulated by this act."

A violation of any of the provisions of the act was declared to be a misdemeanor and an appropriate penalty was prescribed. Standing at the head of the list enumerated in schedule A is "arsenic, its compounds and preparations."

The "Pharmacy Act," "An act to regulate the practice of pharmacy in the state of California," was originally adopted in 1905. (Stats. 1905, p. 535.) It declared in section 1: "From and after the passage of this act it shall be unlawful for any person to manufacture, compound, sell, or dispense any drug, poison, medicine or chemical, or to dispense or compound any prescription of a medical practitioner, unless such person be a registered pharmacist, or a registered assistant pharmacist within the meaning of this act, except as hereinafter provided." Amongst the powers conferred upon the board of pharmacy created thereby, was the power "to regulate the sale of poisons." In 1909 (Stats. 1909, p. 1013) section 16 of the act was amended. This amendment contained much new matter. Thus, it made provision for the board of pharmacy to issue a permit to general dealers in rural districts to sell drugs and ordinary household remedies until such time as "a registered pharmacist shall establish a pharmacy within three miles by the shortest road from the place of business of such general dealer," when no further permit was to be granted. It then provided (and this is the provision bearing upon the questions before the court) that "the following drugs, medicines and chemicals may be sold by grocers and dealers generally without restriction." Then fol-

lowed an enumeration of many articles, the list concluding with "insect powder, fly paper, ant poison, squirrel poison, and gopher poison, and arsenical poisons used for orchard spraying, when prepared and sold only in original and unbroken packages and labeled with the official poison labels."

The state board of pharmacy adopted a regulation as follows:

"Whereas, complaint and knowledge has come to this board that during the year last past not less than two deaths have come to children from Kellogg's Ant Paste (an arsenical preparation) and it appearing to this board that to more fully protect the public health the delivery and sale of this preparation should be more strictly safeguarded, it is hereby resolved by this board:

"That the sale of this preparation will hereafter be permitted only when said sales are made as required for all sales of arsenic and its preparations (*vide* schedule A) and in absolute compliance with sections 1, 2 and 3 of the 'act to regulate the sale of poisons in the state of California.' "

The effect of this resolution, if valid, is to deprive grocers of their right to sell any ant poison which might be an arsenical compound, and to limit the right of sale of such poisons to regular licensed pharmacists.

The laws have thus been set out. The facts are that petitioner is a grocer and was arrested for selling Kellogg's Ant Paste, an ant poison containing arsenic. He bases his right so to do upon the above quoted provision of section 16 of the Pharmacy Act, and contends that the regulation of the board of pharmacy, by which he is forbidden so to do, is an illegal effort to deprive him of a right accorded him by positive law. Upon the other hand, respondent contends that the power to regulate the sale of poisons is expressly conferred upon the board of pharmacy, and that in the exercise of that power it is legal to regulate the sale of arsenical compounds and to place the sale of such compounds exclusively under the control of registered pharmacists, under the provisions of sections 1 and 4 of the Poison Act.

Sections 1, 2, and 3 of the Poison Act, to which reference is made in the resolution of the board of pharmacy, throw certain precautionary limitations and restrictions around the sale of poisons. A book for the entry of sales is required,

with the name, address, and signature of the purchaser, and the quantity of poison sold; a form of label is prescribed which shall bear a skull and cross bones and contain the word "poison"; the name of an antidote, or of suitable common antidotes shall be printed on the label, and the board of pharmacy shall have power to revise and amend the list of antidotes. But, besides being regulatory in the matter of the vending of poisons, sections 1, 2, and 3 of the "Poison Act" are also restrictive. They limit the right to sell, to registered pharmacists alone.

It is manifest from a reading of the Pharmacy Act and the "Poison Act" that they are statutes *in pari materia,* dealing in many particulars with the same subject matter, and are to be construed and harmonized, if possible. And so reading and construing them, the power is expressly conferred upon the board of pharmacy to promulgate "regulations not inconsistent with the laws of this state as may be necessary for the protection of the public" in the sale of poisons. But the very apparent and declared limitation upon the power of the board in this respect is to adopt such regulations as are "not inconsistent with the laws of this state," and the conclusion cannot be avoided that the regulation here under consideration is in direct conflict with an express law of the state—a law which expressly empowers grocers, such as the defendant, to sell ant poisons "when prepared and sold only in original and unbroken packages and labeled with the official poison labels." For, upon most manifest considerations of public welfare, we construe the phrase last quoted to apply to all poisons permitted to be sold by grocers. Little difficulty would be experienced if the regulations here under consideration went no further than to require grocers and dealers generally to adopt the same measures and precautions exacted of registered pharmacists under sections 1, 2, and 3 of the act. Regulations, such as these, in the nature of things, would not be held unreasonable. But the regulation in question unfortunately goes further and, as we have said, bars the grocers and dealers generally from an express right conferred upon them by statute. For, construing these two acts by their terms, they amount to this: that restrictions are cast around the sale of poisons, both as to the persons who may sell and the methods by which the sales may be made. These sales, generally

speaking, may be made only by a registered pharmacist or a
registered assistant pharmacist, and the board of pharmacy
may make reasonable regulations in addition to those pre-
scribed by the state, and may add to the list contained in
schedule A of poisonous, deleterious and injurious substances,
any other such as in its view should properly be placed there.
But with this limitation, however, that certain designated ar-
ticles may be sold by grocers and dealers generally, amongst
which is ant poison in original and unbroken packages. In-.
deed, so far as the safety of the public is concerned, if the
board of pharmacy had seen fit to impose upon the grocers
and dealers the same restrictions and regulations that are or
may be imposed upon the registered pharmacists, everything
desirable would have been accomplished. The same safe-
guards and precautions would then attend the sale, whether
by pharmacist or grocer, and no one would contend that any
greater safety to the public would arise if the original package
of poison were handed out by a drug clerk than would attach
if it were delivered by a grocery clerk.

Under the view thus expressed, we need not be at pains
to follow counsel through their discussion of the law touching
the power of the legislature to delegate its functions, or touch-
ing the power of some designated inferior board or tribunal
to create or declare a crime. For, having determined that the
regulation itself is not one within the power of the board of
pharmacy to pass, all other considerations become subordinate
and unnecessary. In passing, however, it is proper to say
that no doubt, of course, can be entertained of the legislative
power to delegate to proper authority the making of suitable
rules and regulations for the conduct and transaction of any
branch of the business of the state, and for the same legis-
lative power to declare a violation of those rules a penal
offense. (*United States* v. *Moody,* 164 Fed. 269; *United
States* v. *Grimaud,* 220 U. S. 506, [55 L. Ed. 563, 31 Sup. Ct.
Rep. 480].)

What has already been said sufficiently indicates our views
and the reasons therefor, to the effect that the Poison Act
itself is not unconstitutional.

In 1911 the Poison Act was amended by provision regulat-
ing the vending of opium and its derivatives, cocaine, chloral
hydrate, and other like drugs and poisons. Respondent ar-

gues that the legal effect of this amendment is to re-enact the Poison Act as of the date of the amendment, and thus to repeal by implication the authority in the Pharmacy Act for the sale of certain poisons by grocers. But this would be carrying the doctrine of repeals by implication to a most extraordinary length and would do violence to the express terms of the law. (Pol. Code, sec. 325; *Swamp Land etc.* v. *Glide,* 112 Cal. 90, [44 Pac. 451].) Counsel admit their inability to furnish authority sustaining the doctrine of such a repeal, and the absence of such authority is a strong argument against the soundness of the doctrine. The law of course is that repeals by implication are not favored, and they are declared only where an absolute repugnancy between laws exists. Here no such repugnancy exists, and it is the duty of the court to reconcile rather than to destroy. The harmony between and the reconciliation of the terms of the two statutes is abundantly established by treating the authority to the grocers to vend certain poisons as an exception to the general law.

It follows herefrom that the criminal complaints against this defendant charge no crime and that therefore he is entitled to his liberty.

It is therefore ordered that the petitioner be discharged from custody.

Shaw, J., Sloss, J., Angellotti, J., and Melvin, J., concurred.