**UNITED STATES v. JOHNSON and eleven other cases.**

Nos. 142–146, 148, 150–155.

District Court, D. Delaware.

Oct. 16, 1943.
On Reargument Jan. 10, 1944.

Stewart Lynch, U. S. Atty., and Robert C. Barab, Sp. Asst. to U. S. Atty., both of Wilmington, Del., John D. Masterton, Sp. Asst. to U. S. Atty., of Paterson, N. J., and Francis A. Reardon, Chief Enforcement Atty., Office of Price Administration for the District of Delaware, of Wilmington, for the United States.

James M. Tunnell, Jr. (of Tunnell & Tunnell), Frederick P. Whitney, and Howard W. Bramhall, all of Georgetown, Del., for defendants.

LEAHY, District Judge.

Indictments were returned charging a large number of defendants with violation of the Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix, §§ 904(a) and 925(b). Motions to quash and demurrers have been filed. For present purposes, twelve typical indictments are selected. Determination of their legal sufficiency should be dispositive of the same questions lurking in the remaining indictments. Defendants in all of the cases, except certain individuals doing business as Sussex Poultry Company, are charged with having sold poultry in violation of applicable Regulations.[1] Sussex Poultry Company alone

---

[1] The statutes and regulations primarily involved are here specified. The Office of Price Administration was created by Sec. 201(a) of the Emergency Price Control Act of 1942. On October 3, 1942, by Executive Order No. 9250, 50 U.S.C.A. Appendix, § 901 note, 7 F.R. 7871, prices on agricultural commodities were jointly established by the Secretary of Agriculture and the Price Administrator pursuant to 50 U.S.C.A.Appendix, § 921. On December 18, 1942, on the basis of Sec. 2(a), 50 U.S.C.A.Appendix, § 902(a), and Revised Procedural Regulation No. 1, 7 F.R. 8961, the Price Administrator promulgated Revised Maximum Price Regulation No. 269, 7 F.R. 10708, approved by the Secretary of Agriculture under Sec. 3(b) of the Act, 50 U.S.C.A. Appendix, § 903(b), and paragraph 3, Title IV of Executive Order No. 9250.

Regulation 269 has been amended from time to time. 7 F.R. 10708, 10864, 11118, and 8 F.R. 567, 856, 878, 2289, 3316, 3419 and 3792.

is charged with unlawful purchases. The indictments are substantially similar, depending on the time the alleged sales or purchases of poultry occurred, the type of chicken (broilers or fryers) sold or purchased, or the price paid or received by each defendant. In each indictment there is an allegation as to the "ceiling price" which the regulations permitted to be accepted or paid in connection with the transactions. The motions to quash and the demurrers attack the indictments as invalid for failure to state with clarity and definiteness the facts constituting the crime and the venue so as fairly to appraise the defendants of the charges they will be required to meet. Moreover, it is contended that certain of the indictments are fatally defective because they are based on an alleged violation of a regulation which had been superseded prior to the return of the indictments. I prefer to treat each of these grounds in reverse order.

I. *Effect of modification of Revised Maximum Price Regulation 269.* This regulation, effective December 16, 1942, was amended or superseded by Amendment No. 8 of the Price Administrator on April 22, 1943 (8 F.R. 5408 et seq.). In the interim, on March 5, 1943, the District Court of Massachusetts, in United States v. Hark, 49 F.Supp. 95, granted a motion to quash an indictment, based on an alleged violation of a certain regulation, on the ground that it had been repealed prior to the return of the indictment and that the Administrator had not effected any saving clause that would be applicable to the revoked regulation.[2] Shortly after this judicial spanking, the Administrator promptly issued a supplemental order (8 F.R. 4325) on April 2, 1943. It provides: "1305.54 Effect of repeal, revocation, amendment or other modification of price regulations—(a) The repeal, revocation, amendment or other modification of a price regulation or any part thereof shall not have the effect to release or extinguish any penalty or liability incurred under such price regulation unless otherwise expressly provided but such price regulation or part thereof shall be treated

as remaining in force for the purpose of allowing or sustaining any proper suit, action, prosecution, or proceeding with respect to such penalty or liability." Defendants here argue that, on the basis of the common law rule, upon the repeal of an act without any reservation of its penalties, all criminal proceedings taken under it must fall, on the presumption that the repeal was intended as a legislative pardon for past acts; and that the government can not avail itself of 1 U.S.C.A. § 29, as that section refers to "repeal of any statute" and, being in derogation of the common law, it must be strictly construed to the repeal of statutes and not regulations. They pose the question thus:

Where is the source of power in the Administrator to make an order providing that a person shall not be released from prosecution for a violation of a price regulation which has been repealed or amended where the indictment is found after the repeal or modification thereof?

█ The crux of the offenses here is the price per pound paid and received for poultry in violation of the "ceiling price". Admittedly, the price ceilings of live poultry were different on the date of returning a majority of the indictments than at the time of the commission of the alleged violations by most of these defendants. The crime involved came into existence when, pursuant to legislative authority, the Administrator promulgated Regulation 269. Undoubtedly, the April 2, 1943 Supplemental Order 40 was issued in recognition of the principle that unless a statute is continued in force its repeal precludes further prosecution. But Amendment No. 8 is a regulation and not a statute. The only specific saving clause found in the Act, 50 U.S. C.A.Appendix, § 901(b), which permits prosecution after the statute terminates includes all regulations, price schedules and requirements in effect on the terminal date of June 30, 1944. This saving clause would seem to apply to the termination of the Act in the manner specified. It has no reference to regulations theretofore revoked or amended.

---

[2] Later, the same court in United States v. Armour & Co. of Delaware, 50 F.Supp. 347, held that an indictment would lie for a violation of Regulation 280 even though it had been superseded by Regulation 289 prior to the return of the indictment. In the Hark case, the regulation in question had been "revoked" prior to the return of the indict-

ment. In the Armour Company case, the former regulation had merely been "superseded". In short, the court held that when a regulation is superseded and not revoked, the later regulation must be considered as a continuation of the old regulation and not a repeal carrying a general pardon for violations of the old regulation.

It seems to me the Administrator does not have power to expand or extend his statutory authority. Congress might have passed a saving clause to cover the situation here. But it did not do so. And I find myself unable to agree with the suggestion that the Administrator's authority to promulgate a saving clause, in derogation of the common law rule, might be implied generally from the Act. Implied authority in an administrative officer to repeal, extend or modify a law may not be inferred from the grant of authority to enforce it. State v. Retowski, 6 W.W.Harr. 330, 36 Del. 330, 175 A. 325; United States v. 11,150 Pounds of Butter, 8 Cir., 195 F. 657; United States v. Grimaud, 220 U.S. 506, 31 S.Ct. 480, 55 L.Ed. 563.

There is only one provision in the Act upon which an argument may be bottomed that the Administrator has the power to promulgate a saving clause in connection with repealed regulations. In Sec. 2(g), 50 U.S.C.A. Appendix, § 902 (g), it is provided that: "Regulations, orders, and requirements under this Act may contain such provisions as the Administrator deems necessary to prevent the circumvention or evasion thereof." As a saving clause is in derogation of the common law rule, it must indicate its purpose. Obviously, Sec. 2(g) fails to meet this test by a wide margin. The present Administrator has no congressional authority to promulgate a regulation which will have the same effect on a repealed regulation that Title 1 U.S.C.A. § 29 has on a repealed statute. This does not mean, however, that the indictments must fall on this ground. The Administrator's act of amending Regulation 269 can have no effect upon prosecution of persons who have violated Sec. 4(a) of the Act. That section prohibits the buying or selling of commodities at prices higher than those permitted by applicable regulations. The statute creates the offense; and any person who has violated a previously existing regulation remains amenable to prosecution.

This view finds support in United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 57 S.Ct. 216, 226, 81 L.Ed. 255. In that case, defendants had sold arms to certain South American belligerents in violation of a proclamation of the President issued by him under the authority granted by a Joint Resolution of both houses of Congress. The Joint Resolution simply prohibited the sale of any commodities (arms or munitions of war) except as the President might prescribe.[3] Prior to the return of the indictment in that case the President issued a second proclamation which, it was argued, revoked the penal provisions for violation of the first. In sustaining the indictment, the Supreme Court said: "Prior to the first proclamation, the Joint Resolution was an existing law, but dormant, awaiting the creation of a particular situation to render it active. No action or lack of action on the part of the President could destroy its potentiality. Congress alone could do that. The happening of the designated events—namely, the finding of certain conditions and the proclamation by the President—did not call the law into being. It created the occasion for it to function. The second proclamation did not put an end to the law or affect what had been done in violation of the law. The effect of the proclamation was simply to remove for the future a condition of affairs which admitted of its exercise." The views expressed herein, both as to the interpretation of the Curtiss-Wright Export Corporation case and the effect of a prosecution under a repealed regulation originally promulgated under the Emergency Price Control Act, are essentially the same as those expressed by Kalodner, J., in United States v. Trilling et al., D.C. 51 F.Supp. 843, decided September 17, 1943.

Hence, I conclude that modification, revocation, or amendment of Regulation 269 can have no effect on the present prosecution.

II. *Sufficiency of indictments under Regulation 269 in effect prior to April 22, 1943.* Sufficient facts of a crime committed must be stated in an indictment to support a conviction. Specifically, the court and defendants must be able to determine this from the indictment, the statutes and the pertinent administrative regulations passed pursuant to the statutes. If the facts alleged may all be true and yet appear to constitute no offense, the indictment is insufficient. Fontana v. United States, 8 Cir., 262 F. 283; Lynch v. United States, 8 Cir., 10 F.2d 947; United States v. Armour & Co., D.C., 48 F.Supp. 801; 27 Am.Juris. p. 621. The purpose of such

---

[3] Here, Sec. 4(a) does not prohibit sale. It does less—it controls price. Regulation of sale is so closely related to regulation of price, there can be no legal distinction.

requirements is to give a defendant the fair opportunity to prepare his defense and enable him to avail himself of a conviction or acquittal in defense of another prosecution for the same crime. The indictments charging violation of Regulation 269, as it existed prior to April 22, 1943, are clearly insufficient to meet these essential requirements. It is impossible to glean from the allegations of each indictment, the Act, and the regulations what, in fact, the ceiling price was for the commodity, notwithstanding that the prices mentioned in the indictments are the ceiling prices or are below the ceiling prices. Since the Act and the regulation do not establish any specific ceiling price for the commodity sub judice, defendants are entitled to know not only what the government claims the ceiling price to be, but also the manner in which it arrived at this conclusion. It may be that the government's method of calculation is erroneous. If so, defendants should have the opportunity to challenge this defect if, in fact, it exists.

Sec. 1429.20(a) (1) of Regulation 269 prior to its amendment gave the formula for fixing poultry ceiling prices at any given area in the United States. It provided:

"(a) First, except as provided for below in §§ 1429.21 and 1429.22, these maximum base prices are maximum selling prices for poultry items delivered to the buyer's customary receiving point at any place. They do not apply at the seller's shipping point.

"(1) Where any person purchases any poultry item at one place for shipment or reshipment to another place, his customary receiving point shall be the place where shipment ends and not the place where shipment begins.

"(2) All f. o. b. prices are to be calculated in relationship to maximum selling prices at the buyer's customary receiving point. (i) Where any person purchases or sells any poultry item at one place for shipment to another place at a price f. o. b. the seller's shipping point, he shall calculate his maximum f. o. b. price as follows:

"(a) He shall first determine the maximum base price for such poultry item at the place to which it will be shipped; and

"(b) He shall then subtract from such base price his 'freight rate' from the place where shipment begins to the place where shipment ends, and the difference so obtained shall be his maximum selling f. o. b. price for such poultry item."

It is manifest from this regulation that to determine ceiling price in a given situation, one must know (a) the buyer's "customary receiving point"; (b) the freight charges from Chicago to the buyer's "customary receiving point"; (c) whether the prosecution is for an alleged violation of the retail ceiling or of the wholesale ceiling; and (d) with respect to those transactions alleged to have been "f. o. b.", the freight charges from the farm to the buyer's "customary receiving point". This is because the then regulation made no specific price ceiling for the different localities which are set forth in the indictments. The indictments simply set forth a ceiling price. But, in the indictments all the administrative symbols constituting the formula are left as unknowns. The pre-amended regulation, for example, says that the formula gives the maximum base price for items delivered to the "buyer's customary receiving point at any place." Section 1429.20(a) (1) defines the "customary receiving point" in transactions where the buyer purchases poultry at one place for shipment or reshipment to another place, as not being the receiving point, but really the place where shipment ends. It is impossible to compute the price ceiling unless it is known whether the purchasers of the poultry were buying for reshipment to another place. It is true that defendants may have knowledge of this fact, but this is immaterial. If the government erroneously computed the ceiling price, defendants should have the opportunity to object to such error without the necessity of standing trial.

In view of this interpretation of "buyer's customary receiving point", it is neither necessary nor profitable to discuss each component part of the administrative formula. The facts concerning freight charges are available to defendants, but they are unable to utilize this information absent an allegation of the "buyer's customary receiving point". In short, I cannot tell from the indictments whether a crime has been committed—even if all the facts alleged are proved at trial. This alone renders the indictments insufficient. In passing, even if I were skillful enough to give adequate instructions, I doubt what a jury would make of this business in an attempt to reach an intelligent verdict under the present allegations of the indictments.

III. *Sufficiency of indictments under Regulation 269 in effect subsequent*

*to April 22, 1943.* What is said generally with respect to the indictments under the regulation in effect prior to April 22, 1943, applies mutatis mutandis to these particular indictments. The amendment to Regulation 269 changed one of the termini to be used in computing a ceiling price. Formerly, freight was based on a multiple of freight charges from Chicago to the "buyer's customary receiving point". Amended and revised Sec. 1429.20(a) provides: "The maximum base price for live poultry items shall be the maximum base price at the place where the seller parts with physical possession of such live poultry items. The weight of such live poultry items shall be determined at the time when the seller parts with physical possession." Just as in the first group of indictments it was necessary to know the "buyer's customary receiving point", so also it is now necessary to know under the second group where the seller parted with physical possession. Absent allegation of this fact, there is no rational basis upon which to compute a ceiling price, because the amended regulation changed the formula for arriving at a ceiling price. While the indictments do state places where poultry sales occurred, sale, with the passing of title, is not necessarily accompanied by a change in physical possession. The amended regulation makes the place where the seller parts with physical possession dominant. To repeat, this is not necessarily the place where the sale was executed. Reading the indictments, we do not know whether a seller parted with physical possession at his poultry farm, at some place near it, or at any of the towns mentioned in the indictments as the place of sale. Following the history of Regulation 269, Amendment No. 8 did not disturb the provisions of Sec. 1429.19 (c) which still provides:

"(a) Every place in the United States shall have its own maximum base price for the poultry items listed in Table A of this section.

"(1) The word 'place' means any city, town, village, hamlet, or any unincorporated area in the United States where the purchase and sale of any poultry item occurs.

"(2) Every unincorporated area in the United States which is not a city, town, village, or hamlet shall have as its maximum base price for the poultry items listed in Table A of this section the same price as is established for the city, town, village, or hamlet nearest to such unincorporated area."

Because the indictments fail to mention the places where the sellers parted with physical possession of their poultry, without some allegation which will fix the nearest city, town, village, or hamlet, we do not know how the ceiling price was computed by the draftsmen of the indictments. Defendants, therefore, have no means of testing the accuracy of the pleaded conclusion that the ceiling price, for the transactions occurring subsequent to April 22, 1943, was any particular figure. In addition, the indictments are silent as to what are the freight charges from Chicago to the town, city, village, or hamlet nearest to the place where the seller parted with physical possession. And, again, there is no allegation as to whether these prosecutions are for violation of the retail ceiling or the wholesale ceiling. Here, too, information concerning freight charges is available to defendants but can not be utilized without knowing the place where seller parted with physical possession.

Defendants argue that many other defects rest in the indictments. It is unnecessary to discuss them. I conclude that these typical twelve indictments are insufficient because it is impossible to tell from the facts alleged (even if taken as true) whether a crime has been committed.

▇▇▇▇ In the light of these deficiencies, I first considered a judicial cure by ordering the government to furnish a bill of particulars. But, I do not see how either the government or the court have it within their power to cure these patent lapses by the utilization of a bill of particulars. A bill of particulars cannot quicken life into a dead indictment, nor revitalize it as against a sound demurrer or motion to quash. Jarl v. United States, 8 Cir., 19 F.2d 891; Floren v. United States, 8 Cir., 186 F. 961; United States v. Illig, D.C. 288 F. 939; Foster v. United States, 9 Cir., 253 F. 481; and United States v. Bayaud, D.C., 16 F. 376. Cf. Hughes, Federal Practice, § 7046; Cyc. of Federal Procedure, § 2119. And, while the Grand Jury upon the return of the present indictments ritually consented that matters of form may be changed, it is obvious that the matters here discussed are not of form but of substance. Consequently, they cannot be changed, either by consent of a Grand Jury or by a bill of particulars.

Defendants' motions to quash are granted; and the demurrers are also sustained.[4]

## On Reargument

The government's petition for reargument was granted. At the argument it conceded there was no error in the foregoing opinion insofar as it deals with the counts which allege violations on or after April 22, 1943. The reargument was directed to the adequacy of those counts which allege violations prior to April 22, 1943. The error charged is my insistence that the government must allege in these counts of the indictment the "buyer's customary receiving point".

The government contends that the location of the buyer's customary receiving point is immaterial because in every instance the price received for the poultry sold was higher than the highest price which could be received for sales having the "highest price" at any place within the State of Delaware.

The government refers to this price as the "maximum maximum price". I think there is no merit in this contention for the government should not be put to proof of sales or purchases above the "maximum maximum price". It need only to prove a sale above the defendant's particular ceiling price. This is the sale which constitutes the crime. The grand jury is without power to create a higher ceiling price than that which is justified by the regulations and the facts. Since no ceiling price is fixed in Regulation 269, the indictment must show how the grand jury arrived at the ceiling price for the particular defendant for, as I said before, a defendant should be permitted to take advantage of a faulty calculation before trial and consequently he should be informed of all material elements that go to make up the crime. I accordingly refuse to alter the result of my original opinion.

---

4 Counsel for defendants doubtless interposed both motions to quash and demurrers in order to avoid the confusion which has arisen in regard to their respective functions. Each of these procedural forms has been held to raise the same objections to the indictments attacked, i. e., objections to alleged defects intrinsic to the indictments. See Morris v. United States, 9 Cir., 12 F.2d 727, 728; Knauer v. United States, 8 Cir., 237 F. 8, 11; Dillard v. United States, 9 Cir., 141 F. 303, 304; United States v. Jacopetti, D.C., 17 F.2d 771; United States v. Dembowski, D.C., 252 F. 894, 895. In United States v. Oppenheimer, 242 U.S. 85, 86, 37 S.Ct. 68, 61 L.Ed. 161. 3 L.R.A.516, the same defense "was presented in four forms entitled respectively, demurrer, motion to quash, plea in abatement, and plea in bar". Rule 13 of the Federal Rules of Criminal Procedure (Preliminary Draft) abolishes the four formal procedural distinctions from which confusion and delay have arisen, and it then provides in their place a simple motion to dismiss.