## MAGRUDER et al. v. UNITED STATES.

District Court, D. Idaho, S. D.   May 6, 1929.

No. 1382.

See, also, 31 F.(2d) 332.

Hawley & Hawley and O. W. Worthwine, all of Boise, Idaho, for plaintiffs.

H. E. Ray, U. S. Dist. Atty., of Boise, Idaho, and Ralph R. Breshears, Regional Atty., United States Veterans' Bureau, of Nampa, Idaho.

CAVANAH, District Judge.   The nature of this suit is one brought by Charles L. Magruder, as the surviving husband and as the administrator and guardian of June Overton Magruder and Janeth Fordham Magruder, minor daughters of Mildred Martha Magruder, who died on August 30, 1925, to recover on a war risk insurance policy of $10,000 granted on January 9, 1918, to Mildred Martha Overton, the deceased wife and mother of plaintiffs.   The case was submitted to the court upon an agreed statement of facts, and

a jury trial was waived. The material facts are:

That Mildred Martha Overton enlisted in the Army Nurse Corps of the United States on November 10, 1917, and was honorably discharged therefrom October 1, 1919. In her application for the insurance she designated as beneficiary therefor her mother, Martha Fordham Overton, who died September 1, 1925. Mildred Martha Overton was married to Charles L. Magruder on November 20, 1919, and there were born to their marriage the said June Overton Magruder, of the age of 8 years, and Janeth Fordham Magruder, of the age of 6 years. The father of Mildred Martha Magruder died in March, 1921. The monthly premiums of $6.70 on the policy were deducted from the service pay of Mildred Martha Overton from February, 1919, to and including August, 1919, which were 19 in all. It further appears that on August 31, 1919, she was a patient in the United States Army General Hospital at Staten Island, New York, and was entitled to 31 days of accrued leave, and on August 28, 1919, was relieved from all active duty and sent to her home in Brooklyn to be discharged at the expiration of the 31 days accrued leave, to take effect on October 1, 1919, and at that time she had in her possession an order relieving her from further active service in the military establishment. She was at the time suffering from a compensable disability, for which compensation had not been collected, and at the time of her death she was entitled to compensation remaining uncollected in an amount sufficient to pay all premiums and interest. On August 29, 1919, she signed a statement, which was on September 5, 1919, filed in the Bureau of War Risk Insurance at Washington, and was recorded by the paymaster as a cancellation of the authorization set forth in her application for insurance to deduct monthly premiums from her service pay, and which was discontinued after August, 1919. No payment of premiums was made by her after August, 1919, and no objection was made for the failure to take premiums from her active service pay for the month of September, 1919. On October 23, 1924, she executed a claim for compensation for service incurred disabilities, and her claim was on June 29, 1926, rated by the Bureau as follows:

"N. P. Amending rating of 12/15/25 in accordance with new evidence submitted: Temporary partial 25% from date of discharge to 10/30/23. Temporary total from 10/30/23 to 3/31/24 (this includes 3 months after discharge from hospital). Temporary partial 50 per cent. from 3/31/24 to death Incident to service. Exophthalmic goitre, post operative, neurasthenia. Competent. Reg. 86. Not a contributory cause of death."

No compensation was paid to her for any period prior to October 30, 1923, and from that date to and inclusive of November 30, 1924, she was paid by the Bureau the sum of $321.29, and for December, 1924, and January to August, 1295, she was paid $20 each month as compensation. Treasury Decisions 33 of September 20, 1918, 44 of May 17, 1919, 48 and 54 of September 29, 1919, and Bulletin No. 1 of October 15, 1917, of the Bureau, are in evidence. It further appears that in the event the plaintiffs should recover the complaint may be amended to entitle them to accrued installments up to the date of judgment, and an attorney's fee of 10 per cent. of the amount recovered.

The statement signed by Mildred Martha Overton on August 29, 1919, and which the government contends is a cancellation of her insurance, appears to be Government's Exhibit C, and is marked at the top thereof "Application for Insurance," and in a form similar in many respects to the application she made for insurance on November 10, 1917, except there is only inserted in the blank places her name, address, date of birth, age, date of enlistment, amount of insurance, * * * line drawn through the words "authorize the necessary monthly deduction from my pay, or, if insufficient, from any," signature, and the additional insertion in the column under "Name of Beneficiary," the language: "The Act of Congress of October 6, 1917, in so far as it pertains to government insurance has been explained to me, and I fully understand my privileges and rights thereunder, but I do not desire to apply for a government insurance at this time."

On the demurrer to the complaint the question as to whether or not the certificate or policy of insurance had lapsed and terminated from and after September 9, 1919, the date it was alleged the monthly premiums became due, and which was prior to the date of her discharge, was answered by the court in the negative, as it was there stated that the War Risk Insurance Act, as amended June 7, 1924 (38 USCA § 516), granting the right to contract with the government for insurance, was intended to "have a retrospective operation, as it provides in effect that where any person, prior to June 7, 1924, has canceled or allowed his insurance to lapse while suffering from a compensable disability and was at the time of his death entitled to compensation uncollected, then so much of

his insurance as the uncollected amount would purchase if applied as premiums when due shall not be considered cancelled or lapsed." The original act, as amended, and Treasury Decisions 48 and 54 were also considered and interpreted, and the force and effect given to them was that "under these regulations, when the insured requests that his insurance be discontinued and the request is accepted the insurance does not lapse until 31 days from and after the last day of the calendar month in which a premium was payable, and during such grace period the insurance remains in force, but the unpaid premiums shall be deducted from any settlement under the insurance on account of any claims arising during such grace period." See memorandum opinion January 29, 1929.

The War Risk Insurance Act, granting the right to contract for government insurance, was amended June 7, 1924, and it is there provided:

"Where any person has, prior to June 7, 1924, allowed his insurance to lapse while suffering from a compensable disability for which compensation was not collected and dies or has died, or becomes or has become permanently and totally disabled and at the time of such death or permanent total disability was or is entitled to compensation remaining uncollected, then and in that event so much of his insurance as said uncollected compensation, computed in all cases at the rate provided by section 302 of the War Risk Insurance Act as amended December 24, 1919, chapter 16, Forty-First Statutes, page 371, would purchase if applied as premiums when due, shall not be considered as lapsed; and the United States Veterans' Bureau is authorized and directed to pay to said soldier, or his beneficiaries as the case may be the amount of said insurance less the unpaid premiums and interest thereon at 5 per centum per annum compounded annually in installments as provided by law." 38 USCA § 516.

The original act, as amended, provides: "Sec. 1. * * * That there be in such bureau * * * a Division of Military and Naval Insurance, in charge of a * * * commissioner of military and naval insurance. * * *

"Sec. 13. That the director, subject to the general direction of the Secretary of the Treasury, shall administer, execute, and enforce the provisions of this act, and for that purpose have full power and authority to make rules and regulations, not inconsistent with the provisions of this act, necessary or appropriate to carry out its purposes, and shall decide all questions arising under the act, except as otherwise provided in sections 5 and 405. * * * *" 40 Stat. c. 105, pp. 398, 399.

■ And pursuant to authority thus granted, the Director of the Bureau made certain rules and regulations, which have the force of law where they are not inconsistent with any provisions of the acts of Congress. United States v. Grimaud, 220 U. S. 506, 31 S. Ct. 480, 55 L. Ed. 563; Covey v. United States (D. C.) 263 F. 768, 775.

The first thought to be considered and disposed of under the acts of Congress and the regulations is: Did the insured allow her insurance to lapse prior to October 1, 1919, the date of her discharge for failure to pay the premiums coming due within 31 days after the last day of the calendar month in which a premium was payable, and was she suffering from a compensable disability and at the time of her death was there a sufficient amount of compensation remaining uncollected to pay all premiums? It would seem that under the record the insured was suffering from a compensable disability for which compensation was not collected, and at the time of her death she was entitled to compensation sufficient in amount remaining uncollected to pay all premiums, as she was on June 29, 1926, rated by the bureau as having suffered from a compensable service connected disability from the date of her discharge on October 1, 1919, to the date of her death. In such event the insurance would not lapse.

But the government asserts that, although that may be found to be the case, yet the insured on August 29, 1919, canceled and terminated her insurance, and under Treasury Decision 44 of May 17, 1919, which provides in part, "The said insurance shall, however, lapse and terminate * * * (c) upon written request, duly witnessed and forwarded through military channels to the Bureau of War Risk Insurance, for cancellation of the insurance in whole, or in part, and corresponding cessation or reduction of the deductions of premiums from his pay or deposit, in which case the insurance shall terminate or be reduced, as the case may be, on the regular monthly renewal date of the policy in the month following that in which the request is made, and the regular monthly deduction will accordingly be made from the insured's pay or deposit at the end of the calendar month in which the request for cancellation is made," the insurance terminated on September 9, 1919, the regular monthly renewal date in the month following.

The application of this regulation de-

pends upon whether or not the statement of August 29, 1919, constituted a cancellation of the insurance policy, and, if so, did the policy terminate on the regular monthly renewal date of it on the 9th of the month in the month following in which the request was made, or as contended for by the plaintiffs the statement does not constitute a cancellation of the policy, and, if not, Treasury Decisions 48 and 54, adopted on September 19, 1919, subsequent to the adoption of Treasury Decision 44, and before the discharge of the insured, apply and kept the insurance alive.

When we come to consider whether or not "the statement in question contains language sufficient to convey the desire of the insured to cancel her policy, we are confronted with the well-known principle that request for cancellation of an insurance policy must be unequivocal and absolute. 32 C. J. 1261. The provision in the statement, and upon which the Government relies as constituting a cancellation, is that "the act of Congress of October 6, 1917, in so far as it pertains to government insurance, has been explained to me and I fully understand my privileges and rights thereunder, but I do not desire to apply for a Government insurance at this time." And further the provision relating to the drawing of a line through the words in the form of the statement, "I authorize the necessary monthly deduction from my pay, or if insufficient, for any deposit with the United States in payment of the premiums as they become due, unless they be otherwise paid," indicate her intention to cancel and not to draw the deductions. If the parties intended that the statement should be a cancellation of the policy, they certainly made a failure in attempting to express that fact, when using the form of an "Application for Insurance," and stating that the insured did not "desire to apply for a government insurance at this time," or merely blotting out by running a line through the words relating to the authorization of deduction of pay in payment of premiums. There is not contained in the statement any language referring to or stating that the original policy was to be canceled. No reference whatever is made to the policy, and because the bureau thereafter inserted on it the word "cancel" would not, without her consent, make it binding upon her. The authority expressed in the policy to deduct from her pay the monthly premiums was not revoked, and to now hold, after the insured has passed on and not here to speak, that the statement was a cancellation of the policy, would be violative of the rule recognized by the courts that the cancellation of an insurance contract must be absolute and in clear language. No presumption should be dealt in when determining whether a contract of insurance was canceled, and if there should be any ambiguity as to whether an instrument constitutes a cancellation it should be construed most strongly against the party seeking a forfeiture. These policies and the law and regulations are entitled to the most liberal construction in favor of an assured. U. S. v. Cox (C. C. A.) 24 F.(2d) 944; Starnes v. U. S. (D. C.) 13 F.(2d) 212. Therefore I find myself unable to give the interpretation urged by the government to the statement, and entertain the view that it is not a cancellation of the original policy.

The next inquiry is: Did the policy lapse for failure to pay the premiums at the required time? The insured elected to have the premiums paid by deduction from her service pay, as she stated in her application, which is authorized by the law and regulations, "I authorize the necessary monthly deduction from my pay, or, if insufficient, from any deposit with the United States, in payment of the premiums as they become due, unless they be otherwise paid." Bulletin No. 1, issued October 15, 1917, provides that "premiums shall be paid monthly on or before the last day of each calendar month, and will be deducted from any pay due * * * from the United States." The policy being dated January 9, 1918, the first premium would become due February 9, 1918, which must have been deducted out of her February pay made on either the last day of February or March 1st, as the pay roll shows that there were deducted the premiums from her service pay from February, 1918, and for each month thereafter until and including August, 1919, making 19 deductions in all, which would pay the premiums up to August 9, 1919, for the record does not disclose that any deduction was made from the January, 1918, pay, as the premium from January 9th to February 9th was not due until February 9th, and therefore it was not deducted from her January pay, which was made at the end of that month, and so the premium from January 9th to February 9th could not be treated as paid out of the January pay, if it was not due when the January pay was made at the end of that month. Then definitely fixing August 9, 1919, as the last day at which the premiums were paid, we are finally called upon to consider the application of the three

Treasury Decisions, being No. 44 of May 17, 1919, and Nos. 48 and 54 of September 29, 1919.

Treasury Decision 44, adopted May 17, 1919, relates to lapsed, cancellation and reinstatement of yearly renewable term insurance while the insured is in the active military service, and upon written request of the insured to the bureau for cancellation of the insurance the insurance terminates on the regular monthly renewal date of the policy in the month following, and the regular monthly deduction is to be made from the pay of the insured at the end of the calendar month in which the request for cancellation is made.

■ The view having been taken that the statement on August 29, 1919, was not a cancellation or request to terminate the insurance, this regulation would not apply as it requires the "written request" of the insured before the regulation is in force. But, even if the statement be held to be a request to cancel the insurance, the same would not terminate on September 9, 1919, the monthly renewal date following August 9, 1919, because Regulations 48 and 54, issued September 29, 1919, while the insured was in the service, were retrospective, and if the insured requests the insurance to be discontinued and it is accepted, it is not deemed to be canceled until 31 days (the grace period) from the last day of the calendar month in which the unpaid premium was payable, and during such grace period the insurance remains in force, and the unpaid premiums are to be deducted from any settlement under the insurance on account of any claim arising during such grace period.

The provisions of Regulations 48 and 54 pertinent here are:

"In the case of term insurance cancelled or reduced, the term insurance, excepting that portion of the insurance which is converted, shall be deemed to be cancelled or reduced, as the case may be, thirty-one days (the grace period) from the last day of the calendar month on which the unpaid premium was payable. * * *

"In every case where reinstatement, in whole or in part, of lapsed or cancelled term insurance is desired, the insured shall file with the Bureau of War Risk Insurance through military channels a signed application therefor, and make tender of the premium for one month (included in the grace period) on the amount of term insurance to be reinstated, and also of the amount of one month's premium on the reinstated insurance for the month in which application for reinstatement is made. * * *

"For the purpose of determining whether yearly renewable term insurance is or was in force, the grace period for the payment of premiums shall be computed so as to include thirty-one days from and after the last day of the calendar month on which, if the insured is in the service or if he had remained in the service, the unpaid premiums would have been payable. During such grace period the insurance shall remain in force but the unpaid premiums shall be deducted from any settlement under the insurance on account of any claims arising during such grace period."

■ I must assume under the record that the practice of the government was to deduct the premiums out of the pay of the insured, either on the last day of the month in which it was due, or on the first of the succeeding month, and since $6.70 was deducted from the insured's August, 1919, pay, she had the whole of September and to and including October 1st in which to pay the premium from August 9th to October 1st, and that being the case, under Regulations 48 and 54, granting 31 days' grace period from the last day of the calendar month in which the unpaid premium is payable, the policy remained and was in force on October 1, 1919, the day of her discharge, and, if so, it is conceded the plaintiffs are entitled to recover. The Director, in adopting Regulations 48 and 54, intended to cover past cancellations as well as future cancellations when stating, "Any person to whom yearly renewable term insurance has been granted who has canceled," etc., so that there can be no doubt from a reading of the regulation it was intended to cover policies that had theretofore been canceled. Treasury Decision 44 having been specifically repealed by Treasury Decision 48, as paragraph 9 of No. 48 provides that "Treasury Decision 44 and all other regulations heretofore made which conflict with the foregoing are hereby repealed," it was not then in force on September 29, 1919, and while the insured was still in the service and during the 31 days' grace period within which the insurance was kept alive.

The contract or certificate of insurance in the present case clearly states the relation between the government and the insured, as it is there stated that the issuance certificate was "subject in all respects to the provisions of such act, or any amendments thereto, and of all regulations thereunder, now in force or hereafter adopted, all of which, together

with the application for this insurance, and the terms and conditions published under authority of the act, shall constitute the contract." These provisions in the certificate and regulations show that they and the amendatory acts were intended to apply to insurance issued in the past. White v. U. S. et al., 270 U. S. 175, 46 S. Ct. 274, 70 L. Ed. 530; U. S. v. Conklin (9 C. C. A.) 27 F.(2d) 45.

A parallel case to the present one is Baker v. United States, 24 F.(2d) 766, where the Circuit Court of Appeals of the Fifth Circuit gave the same interpretation to the amendatory act and regulations as is given here.

It follows from the views expressed that plaintiffs are entitled to recover upon the policy in question, and accordingly findings will be made and decree entered.