The **SASKATCHEWAN GOVERNMENT INSURANCE OFFICE**, Appellant,

v.

**E. P. PADGETT and First National Bank in Waycross**, Appellees.

**No. 16270.**

United States Court of Appeals Fifth Circuit.

May 29, 1957.

------◆------

J. Edwin Carey, New York City, Edward P. Mulcahy, Jacksonville, Fla., Russell C. Gay, Miami, Fla., Hill, Rivkins, Middleton, Louis & Warburton, New York City, of counsel, for appellant.

Chester Bedell, C. Harris Dittmar, Lloyd Bass, Jacksonville, Fla., Bedell & Bedell, Jacksonville, Fla., of counsel, for appellees.

Before TUTTLE, JONES and BROWN, Circuit Judges.

JONES, Circuit Judge.

For an understanding of the questions presented by this appeal, a somewhat detailed recital of the facts is necessary. The appellee, E. P. Padgett, was the owner of the diesel shrimp boat Pompano Scout. On June 4, 1952, Padgett gave a mortgage on the boat to the appellee, the First National Bank in Waycross, for the original principal sum of $6,500, which was reduced by July 14, 1954, when the boat burned, to $4,085.39, with interest from March 24, 1954. Padgett negotiated for insurance on the boat with Y. E. Hall, an insurance agent and broker at Fernandina Beach, Florida. Hall, in turn, procured the insurance through Gough & King, insurance brokers of New York City. The policy was issued by the appellant, the Saskatchewan Government Insurance Office, having its "head office" in Regina, Saskatchewan, insuring Padgett against loss or damage by fire and other specified risks for a period of twelve months from October 23, 1953. The policy contained a provision that if the insurer agreed to accept the premium in deferred payments and a default occurred it could cancel on five days' notice to the insured. Since the insurer received the full premium in cash this provision was ineffective. There was also a provision fixing the basis for computing return premiums in the event it was mutually agreed to cancel the policy. The policy contained a provision that the loss would be payable to "the assured and to the First National Bank of Waycross, Ga., Mortgagee, as their respective interests may appear."

The premium on the insurance was $1,050. This amount was financed by Padgett under a so-called Stevens Plan. The forms for such financing had been supplied to Hall. The contract was executed in Hall's office and sent by him to Gough & King, Inc. The financing was done by Corn Exchange Bank Trust Company. The agreement signed by Padgett covered the entire premium of $1,050. The financing agreement recited the making of a down payment of $242 and contained a promise to pay to the Corn Exchange Bank the balance of $808 with interest of $18.18 in eight monthly installments of $103.27, commencing November 23, 1953. This agreement contained an assignment to the Corn Exchange of return premiums and any payment on account of a loss which reduced or voided the unearned premiums. The assignment was as security for the payment of the indebtedness evidenced by the agreement. The paragraphs numbered 4 and 5 of the agreement read as follows:

"4. Default by the undersigned insured in the payment of any in-

stallment hereunder when due shall render the whole unpaid balance of principal and interest hereof immediately due and payable, without notice, and if default continues for ten (10) days thereafter, shall constitute an election by the undersigned insured to cancel said policy. It is agreed that, in such event, the undersigned insured will promptly return the policy and the bank is hereby authorized to notify the insurance company of such cancellation, and to collect and receive from such company all return or unearned premium for application as above mentioned.

"5. To effectuate the foregoing, said insurance company is hereby authorized and directed:

"(a) To pay any return premium to said bank which may become due under the policy, other than from cancellation; and

"(b) To pay any unearned premium to said bank which may become due on account of cancellation of said policy at any time by the undersigned insured, the bank, or the insurance company; and

"(c) To include the name of the said bank as payee with the undersigned insured in any check or draft issued on account of any loss, which may be or become payable to the undersigned insured, but only in the event it reduces or voids the unearned premium of the policy, and subject however to all mortgagee interest, if any."

Gough & King had an arrangement with Saskatchewan for financing premiums under the Stevens Plan, and it had an arrangement with the Corn Exchange Bank for handling the premium financing contracts. Saskatchewan had authorized the Corn Exchange Bank to make checks for all premiums financed by the bank to Gough & King. Padgett defaulted in making timely payment of his installment due Corn Exchange Bank on December 23, 1953. The bank sent him a notice dated December 29, 1953, which read:

"We wish to advise you that the installment payment on your premium finance loan with us is past due. We further advise you that, according to the terms of the note, and agreement, a default in the payment of any installment constitutes an election by the assured to cancel the policy(s).

"Kindly favor us with your check for $96.72 for the installment due Dec. 23, 1953.

"If we do not hear from you by Jan. 4, 1954, we will be obliged to take the necessary steps to cancel the policy(s) concerned.

"Your down payment check for $242.00 was returned yesterday marked 'Insufficient funds'. We redeposited it and marked it 'Wire Fate'. Please explain this."

Padgett failed to make payment when due of the installment due January 23, 1954, and received a notice similar to that sent to him the preceding month, differing, of course, as to dates and omitting the reference to the check for the down payment. The January, 1954, notice stated, "Charge for reinstating, if policy is cancelled—$5.00." Payments of these delinquent installments were made by Padgett and Saskatchewan was never informed of these delinquencies. Padgett was again late in meeting his payment due in March and late in responding to the notice sent him, similar to the notice sent in December and January. On April 6, 1954, the Corn Exchange Bank wrote Saskatchewan a form letter identifying the policy and saying:

"We wish to advise you that the above mentioned insured is in default under the terms of a note and agreement with us covering the financing of the premium(s) on the above captioned policy(s) and we hereby request cancellation of said policy(s).

"Those provisions of the note and agreement applicable in this in-

stance are (a) a default constitutes an election by the assured to cancel the policy(s) (b) authorizes us to notify the Insurance Company of such cancellation under the terms of the policy and note (c) assigns to us the unearned premium(s) (d) authorizes us to collect the unearned premium(s). Cancellation date (per Contract)—4/2/54.

"Will you kindly give this matter your immediate attention and favor us with your remittance. Please acknowledge receipt of this letter".

No acknowledgment was made by Saskatchewan of the receipt of the foregoing letter. A remittance for the delinquent March installment was sent to the Corn Exchange Bank and on April 14, 1954, it wrote Saskatchewan requesting that it disregard the letter of cancellation. This notice was acknowledged by Saskatchewan by a letter in which it was said that:

"The cancellation of the policy given by you per your letter of April 6th, is hereby rescinded, and this is our confirmation."

The delayed remittance of the March installment was made by the Waycross Bank, the mortgage holder. The payment was sent to Hall, the agent through whom the insurance was procured by Padgett. In the letter with which it transmitted its check, the Waycross Bank requested information as to the balance due on the contract and expressed the belief that it would pay it off and let Padgett pay it. Hall requested the Corn Exchange Bank to furnish the information but it does not appear that it did so. Another default occurred with respect to the payment due in May, 1954. A notice was sent similar to that given with respect to the December, 1953, payment.

The final payment was due on June 23, 1954. It was not paid when due. Of the eight installments only three had been paid without Padgett being warned of the consequences of his default. Padgett was in Texas and the insured vessel was shrimping off the shore of Texas. A notice of default was sent to Padgett, addressed to him at Waycross, Georgia.

No notice of default was given to the Waycross bank. On July 4, 1954, Padgett sent a night letter telegram to the Corn Exchange Bank saying he would be able to make payment on July fifteenth and requesting advice by mail as to the amount of interest and penalty. This telegram was delivered to Corn Exchange Bank on July 6th. Padgett testified that on July 8 or 9 he received a letter from the Bank, signed by its Vice President Lehing, extending the time for payment and fixing a charge of $7 for late payment. Lehing denied that such a letter was sent and testified that no reply was made. On July 7, 1954, the Corn Exchange Bank sent Saskatchewan a form letter, requesting cancellation of the policy. This was the same in substance as the notice of April 6th except in the later notice the cancellation date was stated to be July 3, 1954.

About 2:30 o'clock on the morning of July 14, 1954, the insured boat burned at Port Isabel, Texas. Padget telephoned Hall's office about eight that morning. Hall arranged to have the vessel surveyed by E. M. Dierlam who determined the loss was total. At 12:48 p. m. on July 14th, Padgett sent Corn Exchange Bank a telegraphic money order for $110.27 as payment of the June 23rd installment. On July 15th the Corn Exchange Bank, without knowledge of the fire, wrote Saskatchewan:

"Kindly disregard our letter of cancellation on the above policy as we have received the installment due June 29 [sic], 1954.

"We regret any inconvenience we may have caused you due to circumstances beyond our control.

"Please confirm receipt of this letter."

On July 16th, the day after the foregoing letter was written but before it had been delivered, Saskatchewan wrote to Gough & King saying it had received advice from the Corn Exchange Bank that Padgett's June installment had not been paid. In this letter to Gough & King it was said by Saskatchewan:

"We are holding our file in abeyance for ten days, and if we have not heard anything further, the policy will be cancelled, and premium refunded on a short rate basis. Please advise, why, Mr. Padgett is always late in paying his installments".

At the time the foregoing letter was written Saskatchewan had no notice of the loss. Although it had not made the requested acknowledgment of the advice to it in the Notice of the Corn Exchange Bank dated July 7th, Saskatchewan replied on July 20th to the July 15th letter, saying:

"We thank you for your letter of July 15th and as requested, we rescind the cancellation notice given in your letter of July 7th, and the policy will continue in full force and effect."

At the time this letter was written no notice had reached Saskatchewan at Regina of the loss of the insured boat.

Meanwhile Hall had advised Gough & King and Gough & King had written Saskatchewan of the loss and of the appointment of Dierlam. This advice was received by Saskatchewan on the morning of July 19, 1954. On July 29, 1954, Saskatchewan sent to the Corn Exchange Bank its check for $252 as the return premium on the policy computed on a short rate basis for the portion of the term from July 3, 1954, to the fixed expiration date. The Corn Exchange Bank returned the check with the statement that it had been paid. Saskatchewan then attempted to get Padgett to accept this sum and he rejected it.

When Dierlam determined that there was a total loss of the insured boat he had it sold. Padgett requested that he be permitted to exclude the propeller and some new nets from the sale but Dierlam insisted that they be sold. The sale produced $1,703, and this amount was paid by Dierlam to Padgett.

Saskatchewan, contending that the policy was not in force at the time of the loss, denied liability. Padgett and the Waycross Bank sued Saskatchewan, basing Federal jurisdiction on diversity of citizenship. After a trial without a jury, the district court found that the policy was in effect at the time of the fire and entered judgment for the $20,000 less the $1,703 paid. The court awarded to the Waycross Bank the unpaid balance of its mortgage and interest and the remainder to Padgett. The judgment included an attorneys' fee, as authorized by Florida Statutes, § 625.08. From the judgment Saskatchewan has appealed.

The changes occurring in the needs of the business world for financing have called for expansion of credit facilities, the development of new credit devices and the modification of prior forms. Examples are seen in the uses of trust receipts and in the assignment of accounts receivable. The financing of hazard insurance premiums, of which the Stevens Plan involved in this case is typical, is another of these developments. The plan is so devised that the reducing balance owing to the lending institution will at all times be less than the return premium on the policy computed on a short rate basis. The contract between the insured and the lender assigns to the lender, as security, return premiums and any loss payments which reduce or void return premiums. The agreement which Padgett signed, contained the provision that a default should constitute an election of the insured to cancel the policy. Such is the fiction by which the security holder is permitted to realize upon its collateral.

There is no provision in the policy issued by Saskatchewan which permits cancellation by or on behalf of Padgett. It has been urged that the policy was not subject to cancellation at the option of either insured or insurer except upon the happening of events as specified in the policy, which had not occurred. Such seems to be in keeping with the general rule. 29 Am.Jur. 272, Insurance § 297. In Murphree v. National Life & Accident Insurance Co., 168 Miss. 667, 150 So. 534, 151 So. 748, it was said:

"There are two ways and two only in which a policy of insurance in full

and unimpaired force may be legally surrendered and cancelled: First, under the terms written in the policy itself; and, second, under the terms of a subsequent oral or written agreement. * * * If by a subsequent oral or written agreement, * * *. If the agreement is brought about by means of a proposal on one side and acceptance on the other, the acceptance must be in the exact, or substantially exact, terms of the proposal, and the acceptance must be communicated to the proposing party." 150 So. 535.

■ We are not of the opinion, as Saskatchewan has urged, that the Stevens Plan agreement was a part of the insurance contract and incorporated into it the provision that the Corn Exchange Bank could effect cancellation. Such an identification lacks reason or support in the terms of either the policy or the Stevens Plan agreement, and might be inimical to the operation of the plan by the Bank. See Clark v. Employers Mutual Casualty Co., 8 Cir., 1937, 90 F.2d 667, 115 A.L.R. 1204. It is apparent, however, from the evidence that Saskatchewan had not only acquiesced in the arrangement effected between those insured under its policies and the Corn Exchange Bank in the financing of premiums, but it had given its cooperation and had, it seems, received some benefits by the earlier receipt of premium payments and in other respects. Padgett cannot repudiate the authority given by him. 2 Am.Jur. 65, Agency, § 80. The Waycross Bank is in no better position. None of the parties to the appeal can be heard to say that the insurance policy was not subject to cancellation by the Corn Exchange Bank as provided in the agreement between it and Padgett.

■ That there was a default by Padgett is established. The agreement which permitted cancellation of the policy by Corn Exchange Bank and the payment to it of the return premium upon Padgett's default is not shown to be illegal or void. Chamberlain v. Employers' Liability Assurance Corp., 289 Mass. 412, 194 N.E.

310; Dawson v. Concordia Fire Ins. Co., 192 N.C. 312, 135 S.E. 34. See Annotation, 115 A.L.R. 1212. The question, as we see it, is whether there was an effective cancellation. It was early said in Head & Amory v. Providence Ins. Co., 2 Cranch 127, 6 U.S. 127, 2 L.Ed. 229:

"A contract varying a policy is as much an instrument as the policy itself, and therefore, can only be executed in the manner prescribed by law. The force of the policy might indeed have been terminated by actually cancelling it, but a contract to cancel it, is as solemn an act, as a contract to make it. * * *"

In Magruder v. United States, D.C.Idaho 1929, 32 F.2d 807, 810, it was said:

"When we come to consider whether or not the statement in question contains language sufficient to convey the desire of the insured to cancel her policy, we are confronted with the well-known principle that request for cancellation of an insurance policy must be unequivocal and absolute."

This principle applies whether, as in the decided case, the insured has the right of cancellation pursuant to a policy provision, or, as in the case here, the right of cancellation exists pursuant to a contract between the insured and its assignee which the insurance company has recognized.

After the earlier notice following the default in the March payment which, in form, advised Saskatchewan of cancellation, Corn Exchange Bank accepted Padgett's payment and directed Saskatchewan to disregard the letter of cancellation which was sent eight days earlier. This is indicative of an intent that the delivery of the notice to Saskatchewan was not to be regarded as an unconditional and final termination of the policy and of the rights and liabilities. The notice of the Corn Exchange Bank to Saskatchewan following the default in the June payment was of the same tenor and was given with the same intent. When the notice was received by Saskatchewan it did not regard it or treat it as effect-

ing a cancellation. It advised Gough & King that if they heard nothing for ten days the policy would be cancelled. Saskatchewan then regarded the policy as being in force. When the Corn Exchange Bank sent its letter to Saskatchewan requesting it to disregard the letter of cancellation the bank did not regard the policy as then being cancelled. When Saskatchewan received this letter it did not regard the policy as then cancelled as it wrote the Corn Exchange Bank that it rescinded "the cancellation notice", thus reiterating that the policy had not been cancelled. Further confirmation that the policy had not been cancelled is found in the letter of Saskatchewan to the Corn Exchange Bank where it stated that the policy would "continue in full force and effect". This shows that the effective coverage of the policy had not been interrupted.

█ If there was a cancellation it was by virtue of the exercise by the Corn Exchange Bank of the power granted to it by Padgett and became effective when notice of cancellation was given to Saskatchewan. As we have shown, the notice was not so intended by the Bank or so regarded by Saskatchewan. The language used discloses an intent that the giving and receipt of the notice was not to effect a cancellation of the policy at any time prior to the occurrence of the loss. As he might have been bound by an intentional and effective notice of cancellation, so may Padgett benefit from the absence of any intentional and effective notice of cancellation even though he was in default. We need not here decide whether the Bank's right to cancel had, by its conduct, been lost. It is enough to say that there was no intent to exercise it. If Saskatchewan had intended to treat the notice as cancelling the policy it should have paid out the unearned premium. The retention of the unearned premium by Saskatchewan until after it had decided to deny liability is further confirmation of our conclusion that the policy was in effect when the loss occurred.

It is our conclusion that the policy of insurance upon which this litigation is based had not been cancelled when there was a loss of the property insured. Therefore the judgment is

Affirmed.