821 F.2d 714
 26 ERC 1110, 261 U.S.App.D.C. 226, 17
Envtl. L. Rep. 21,015
 UNITED TECHNOLOGIES CORPORATION, Pratt & Whitney Group, Petitioner,
v.
U.S. ENVIRONMENTAL PROTECTION AGENCY, Respondent,
American Petroleum Institute, American Iron and Steel
Institute, Edison Electric Institute, et al.,
Chemical Manufacturers Association, Intervenors.
ENVIRONMENTAL DEFENSE FUND, INC., et al., Petitioners,
v.
Lee M. THOMAS, Administrator and U.S. Environmental
Protection Agency, Respondents,
American Petroleum Institute, American Iron and Steel
Institute, Edison Electric Institute, et al.,
Chemical Manufacturers Association, Intervenors.
AMERICAN PETROLEUM INSTITUTE, Petitioner,
v.
U.S. ENVIRONMENTAL PROTECTION AGENCY, et al., Respondents,
Edison Electric Institute, American Iron and Steel
Institute, Intervenors.
AMERICAN IRON AND STEEL INSTITUTE, Petitioner,
v.
Lee M. THOMAS, Administrator and U.S. Environmental
Protection Agency, et al., Respondents,
American Petroleum Institute, Edison Electric Institute,
Chemical Manufacturers Association, Intervenors.
MOTOR VEHICLE MANUFACTURERS ASSOCIATION of the UNITED
STATES, INC., Petitioner,
v.
Lee M. THOMAS, Administrator and U.S. Environmental
Protection Agency, Respondents,
American Petroleum Institute, American Iron and Steel
Institute, Edison Electric Institute, et al.,
Chemical Manufacturers Association, Intervenors.
EDISON ELECTRIC INSTITUTE, et al., Petitioners,
v.
U.S. ENVIRONMENTAL PROTECTION AGENCY, Respondent,
American Petroleum Institute, American Iron and Steel
Institute, Chemical Manufacturers Association,
Delmarva Power and Light Company, Intervenors.
 Nos. 85-1654, 85-1655, 85-1658 to 85-1660 and 85-1662.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 2, 1987.
Decided June 23, 1987.
 
 Petitions for Review of Orders of the U.S. Environmental Protection agency.
 James B. Atkin, San Francisco, Cal., with whom were Frederic D. Chanania and Arnold S. Block, Washington, D.C., for American Petroleum Institute, petitioner in No. 85-1658 and intervenor in Nos. 85-1654, 85-1655, 85-1659, 85-1660 and 85-1662.
 Robert Wise and John W. Casey, for United Technologies Corp., Pratt & Whitney Group, petitioner in No. 85-1654.
 Gary H. Baise, Karl S. Bourdeau and Paul E. Shorb, III, for American Iron and Steel Institute, petitioner in No. 85-1659 and intervenor in Nos. 85-1654, 85-1655, 85-1658, 85-1660 and 85-1662.
 John T. Smith, II, David F. Zoll and Kenneth M. Kastner, for Chemical Mfrs. Ass'n, intervenor in Nos. 85-1654, 85-1655, 85-1659, 85-1660, 85-1662 were on the joint brief for petitioners and intervenors. Stark Ritchie and John B. Fahey also entered appearances.
 William R. Weissman, Washington, D.C., with whom Charles C. Abeles and Douglas H. Green, were on brief, for Edison Elec. Institute, et al., petitioner in No. 85-1662 and intervenor in Nos. 85-1654, 85-1655, 85-1658, 85-1659 and 85-1660 and Delmarva Power and Light Company, intervenor in No. 85-1662. Sue M. Briggum also entered an appearance.
 Robert V. Percival, Washington, D.C., with whom David G. Lennett, Jane L. Bloom and Donald Strait, were on brief, for Environmental Defense Fund, et al., petitioners in No. 85-1655.
 Robert A. Fineman, Detroit, Mich., Joseph M. Polito and William H. Crabtree, were on brief, for Motor Vehicle Mfrs. Ass'n of the U.S., Inc., petitioner in No. 85-1660.
 Michael A. McCord, Washington, D.C., Atty., Dept. of Justice and Christina Kaneen, Atty., E.P.A., of the Bar of the Supreme Court of Illinois, pro hac vice by special leave of the Court, with whom Mark A. Greenwood, Asst. Gen. Counsel and Barbara E. Pace, Atty., E.P.A., were on brief, for respondents in Nos. 85-1654, 85-1655, 85-1658, 85-1659, 85-1660 and 85-1662.
 Before EDWARDS and STARR, Circuit Judges, and SWYGERT,* Senior Circuit Judge, United States Court of Appeals for the Seventh Circuit.
 Opinion for the Court filed by Circuit Judge EDWARDS.
 HARRY T. EDWARDS, Circuit Judge:
 
 
 1
 These consolidated cases involve various challenges to a final rule promulgated by the Environmental Protection Agency ("EPA" or the "Agency") to conform its hazardous waste regulations to new statutory provisions enacted in the Hazardous and Solid Waste Amendments of 1984, Pub.L. No. 98-616, 98 Stat. 3221 (the "1984 Amendments"). The 1984 Amendments were enacted by Congress to modify and augment the hazardous waste provisions of the Resource Conservation and Recovery Act of 1976 ("RCRA" or the "Act"). See Hazardous Waste Management System; Final Codification Rule (the "Final Rule"), 50 Fed.Reg. 28,702 (1985) (codified in scattered sections of 40 C.F.R. pts. 260-262, 264-266, 270-271, 280 (1986)).
 
 
 2
 Based on our careful review of the Final Rule, and the arguments advanced by the parties, we conclude that the regulations promulgated by the EPA are, for the most part, reasonable and consistent with the 1984 Amendments. There is one aspect of the Final Rule, however, that is inconsistent with the plain meaning of the 1984 Amendments. Accordingly, we affirm in part and reverse and remand in part.
 
 I. BACKGROUND
 
 3
 Subtitle C of the RCRA, 42 U.S.C. Secs. 6921-6934 (1982), established a "cradle-to-grave" regulatory structure overseeing the safe treatment, storage and disposal of hazardous waste. Under the Act, the EPA is required to identify those solid wastes that are subject to regulation as hazardous waste,[1] and to promulgate regulations establishing performance standards applicable to owners and operators of new and existing facilities engaged in the treatment, storage and disposal of hazardous waste. Section 3004(a) of the Act, 42 U.S.C. Sec. 6924(a) (Supp. III 1985). Under section 3005 of the RCRA, 42 U.S.C. Sec. 6925 (1982 & Supp. III 1985), owners and operators of such treatment, storage or disposal facilities must obtain operating permits from the Agency or from a state authorized by the EPA to issue such permits. Because many hazardous waste management facilities were already in operation when Subtitle C was enacted, Congress allowed existing facilities to operate on an "interim status" basis, until administrative action is taken on a section 3005 permit. Section 3005(e) of the Act, 42 U.S.C. Sec. 6925(e) (Supp. III 1985). All permittees are required to comply with applicable section 3004 standards. Section 3005(c) of the Act, 42 U.S.C. Sec. 6925(c) (Supp. III 1985).
 
 
 4
 The EPA has promulgated several sets of regulations implementing Subtitle C of the RCRA. See 40 C.F.R. pts. 260-266, 270, 271 (1986). The section 3004 standards applicable to facilities with permits are set forth in Part 264. Part 265 sets forth the standards applicable to facilities operating under interim status.
 
 
 5
 Although the RCRA, as originally enacted, imposed a regulatory scheme on the active management of hazardous wastes, it did not require permittees to take significant remedial action to correct past mismanagement of hazardous waste. In 1980, however, Congress enacted the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. Secs. 9601-9657 (1982), to provide for the cleanup of hazardous releases not addressed by other statutory programs. Included in CERCLA was a "Superfund" to pay for such corrective action pending recovery of the cleanup costs from the owner or operator who was responsible for the release.
 
 
 6
 Congress comprehensively amended the RCRA in 1984, when it enacted the 1984 Amendments. The 1984 Amendments imposed additional section 3004 requirements on permittees. Of particular relevance here is section 3004(o )(1)(A), 42 U.S.C. Sec. 6924 (o)(1)(A) (Supp. III 1985), which requires every landfill or surface impoundment unit for which an application for a final determination regarding the issuance of a permit is received after November 8, 1984 to conform with certain design and monitoring requirements. Also, under section 3004(u), 42 U.S.C. Sec. 6924(u) (Supp. III 1985), owners and operators must take corrective action for all releases of hazardous waste or constituents from any solid waste management unit at a facility regardless of the time at which waste was placed in the unit.
 
 
 7
 The Agency then proceeded to promulgate regulations to implement the 1984 Amendments. On July 15, 1985, it issued the Final Rule, the purpose of which was "to incorporate into the existing Subtitle C regulations a set of requirements from the new RCRA amendments that became effective as a matter of statute in the short term." 50 Fed.Reg. at 28,703. The Final Rule was made effective immediately and was promulgated without prior notice or an opportunity for comment by interested parties. Thereafter, the Agency promulgated other regulations implementing other aspects of the 1984 Amendments, which were subjected to notice and comment procedures before adoption as a final rule. See Interim Status Standards for Owners and Operators of Hazardous Waste Treatment, Storage, and Disposal Facilities; Final Rule, 52 Fed.Reg. 8704 (1987). As of this date, the Agency is considering petitions seeking the promulgation of additional regulations to flesh out portions of the 1984 Amendments. See Request for Stay Pending Judicial Review or for Reconsideration, reprinted in Addendum A to Brief for the Respondent.
 
 
 8
 Several groups of petitioners have asked this court to review various aspects of the Final Rule. One group, hereafter referred to as "Industry Petitioners,"[2] is composed of industrial concerns that, as a by-product of their production processes, generate hazardous waste that they manage on-site. Several utilities and utility associations (including the Edison Electric Institute), hereinafter referred to as "EEI," have also challenged certain of the regulations. Finally, the Environmental Defense Fund and the Natural Resources Defense Council (collectively "EDF") have filed a petition for review.
 
 II. PROCEDURAL ISSUES
 
 9
 The Industry Petitioners contend that, because the Final Rule was promulgated without notice and comment under the Administrative Procedure Act ("APA"), the Final Rule must be invalidated. The EPA, however, maintains that the Final Rule is an "interpretative" rule, and thus outside the scope of the notice and comment requirement. Alternatively, the EPA contends that, even if the Final Rule is a "legislative" rule, the Agency properly invoked the "good cause" exception to the notice and comment requirement. We agree that most, if not all, of the Final Rule is "interpretative" in nature, and thus is not subject to notice and comment procedures. As to those portions of the Final Rule that arguably are "legislative" in nature, we find that the Agency properly invoked the "good cause" exception.
 
 
 10
 The EPA also asserts that, because EDF's claims are addressed at the failure of the Agency to promulgate certain regulations rather than at deficiencies in the Final Rule itself, EDF's petition for review is not properly before this court at this time. We agree. Although it is possible that a suit may be lodged in this court at some point in the future, EDF has not properly invoked this court's jurisdiction at this point.
 
 
 11
 A. "Interpretative" versus "Legislative" Rules
 
 
 12
 The APA specifically excludes "interpretative" rules from its notice and comment procedures. 5 U.S.C. Sec. 553(b)(A) (1982). The meaning of this exclusion was amplified by the court sitting en banc in General Motors Corp. v. Ruckelshaus, 742 F.2d 1561, 1565 (D.C.Cir.1984) (en banc), cert. denied, 471 U.S. 1074, 105 S.Ct. 2153, 85 L.Ed.2d 509 (1985), in which certain general principles were set forth to be used in determining whether or not a rule is interpretative. As a starting point, the court found that the agency's characterization of a rule is "relevant," although not necessarily "dispositive." As a more general principle, however, the court offered the following test to distinguish between interpretative and legislative rules: "An interpretative rule simply states what the administrative agency thinks the [underlying] statute means, and only ' "reminds" affected parties of existing duties.' On the other hand, if by its action the agency intends to create new law, rights or duties, the rule is properly considered to be a legislative rule." Id. (quoting Citizens to Save Spencer County v. EPA, 600 F.2d 844, 876 n. 153 (D.C.Cir.1979)) (citations omitted).
 
 
 13
 Applying these general principles in General Motors, the court found the rule at issue to be interpretative because the agency characterized the rule as interpretative, the "entire justification for the rule [was] comprised of reasoned statutory interpretation, with reference to the language, purpose and legislative history" of the statute, and "the rule did not create any new rights or duties; instead, it simply restated the consistent practice of the agency" in construing the underlying statutory provision. Id. Stated slightly differently, " 'interpretative rules are statements as to what the administrative officer thinks the statute or regulation means,' " whereas legislative rules have "effect[s] completely independent of the statute." Cabais v. Egger, 690 F.2d 234, 238 & n. 9 (D.C.Cir.1982) (emphasis in original) (quoting Gibson Wine Co. v. Snyder, 194 F.2d 329, 331 (D.C.Cir.1952)).
 
 
 14
 Turning to the Final Rule in the instant case, we find that most if not all of it is properly viewed as interpretative. The Agency clearly so viewed it. It saw the "principal purpose" of the Final Rule as being "to codify the new statutory requirements" of the 1984 Amendments. 50 Fed.Reg. at 28,703. In the preamble to the Final Rule, the EPA explained and interpreted its regulations, not by reference to whether the Agency was reasonably exercising its delegated power to promulgate rules, but by reference to "its view of what Congress intended these new requirements to be. Such statements of statutory interpretation are derived from the legislative history and EPA's view of Congressional purposes for the new requirements." Id. Indeed, the EPA carefully segregated out proposed rules which "deal with issues that are logical outgrowths of the new provisions rather than matters addressed directly by the statutory language," id., and has subjected those rules to notice and comment procedures. See Hazardous Waste Management System; Proposed Rule, 51 Fed.Reg. 10,706 (1986).
 
 
 15
 We find it irrelevant that the Agency, in an abundance of caution, also invoked the "good cause" exception to the APA notice and comment requirement. See 5 U.S.C. Sec. 553(b)(B) (1982). This did not change the character of the rule from interpretative to legislative. Rather, it merely assured that, if a court determined that any portion of the Final Rule was legislative, the Agency had on record its justifications for an invocation of the "good cause" exception. The main point here is that most of the regulations at issue are prototypically interpretative in nature, because they merely reflect the Agency's view of statutory duties imposed by the 1984 Amendments.
 
 
 16
 The Industry Petitioners contend that at least some of the regulations at issue "create[ ] legal obligations not spelled out ... explicitly by statute and thus create[ ] corresponding 'new duties' in affected parties." Citizens to Save Spencer County v. EPA, 600 F.2d 844, 876 n. 153 (D.C.Cir.1979). The Industry Petitioners, however, have misread our cases. Apparently, they read Spencer County and other cases to hold that, where congressional intent may not be discerned from the plain meaning of a statute, an agency's interpretation of the meaning of the statutory provision is a legislative rule, rather than an interpretative rule. In other words, rules that "interpret" rather than "restate" statutory language are not "interpretative." Such a narrow view of what constitutes an interpretative rule would make little sense as a logical or practical matter, and is refuted by the case law.
 
 
 17
 In Spencer County, for example, the rules found to be legislative were rules in which the agency sought to fill gaps and inconsistencies left by the statutory scheme. See id. at 879. In other words, the rules picked up where the statute left off; "by no stretch of the imagination could [they] have been derived by mere 'interpretation' of the instructions of Congress." Id. The proper distinction between legislative and interpretative rules is shown even more clearly in Chamber of Commerce v. OSHA, 636 F.2d 464 (D.C.Cir.1980). There, after a judicial determination that neither the Occupational Safety and Health Act of 1970 (the "OSHA Act"), nor section 3(o) of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. Sec. 203(o) (1982), required that employees be compensated for time spent accompanying OSHA inspectors during work site examinations, see Leone v. Mobil Oil Corp., 523 F.2d 1153 (D.C.Cir.1975), the Department of Labor promulgated a rule requiring employers to so compensate their employees. The court reasoned that such a rule could not be interpretative because its decision in Leone foreclosed the possibility that any statutory provision of either the FLSA or the OSHA Act imposed a duty for employers to pay employees for time spent accompanying inspectors during on-site inspections. Because "Congress ha[d] not 'legislated and indicated its will' on the question ...[,] the Administration must have done more than exercise its ' "power to fill up the details." ' " 636 F.2d at 469 (quoting United States v. Grimaud, 220 U.S. 506, 517, 31 S.Ct. 480, 483, 55 L.Ed. 563 (1911) (quoting Wayman v. Southard, 23 U.S. (10 Wheat.) 1, 43 (1825)). Rather, "the Administration has attempted through th[e] regulation to supplement the [OSHA] Act, not simply to construe it, and therefore the regulation must be treated as a legislative rule." Id. (emphasis added).
 
 
 18
 Thus, these cases show that what distinguishes interpretative from legislative rules is the legal base upon which the rule rests. If the rule is based on specific statutory provisions, and its validity stands or falls on the correctness of the agency's interpretation of those provisions, it is an interpretative rule. If, however, the rule is based on an agency's power to exercise its judgment as to how best to implement a general statutory mandate, the rule is likely a legislative one. Here, there is no question that the Final Rule is an attempt to construe specific statutory provisions. The validity of the regulations depends on whether or not the Agency has correctly interpreted congressional intent as expressed in the 1984 Amendments. As such, it is clearly an interpretative rule.
 
 B. The "Good Cause" Exception
 
 19
 Assuming, arguendo, that at least some of the regulations could plausibly be classified as "legislative," the Agency properly invoked the "good cause" exception to the notice and comment requirement. Pursuant to 5 U.S.C. Sec. 553(b)(B) (1982), the Agency published, along with the Final Rule, a statement setting forth its reasons for finding that following notice and comment procedures would be "impracticable, unnecessary, or contrary to the public interest." It provided three principal reasons: (1) Congress explicitly authorized the use of the good cause exception in the promulgation of these regulations; (2) there was need for immediate action; and (3) the nature of the regulations was such that the Agency would not be likely to reap any benefits from allowing public comment. 50 Fed.Reg. at 28,703-04. We agree that, given the nature of these regulations, and the applicable legislative history expressed in the Conference Committee Report,[3] the Agency acted properly in dispensing with the notice and comment requirement, even if the rule was legislative. Although we construe the good cause exception narrowly, see New Jersey v. EPA, 626 F.2d 1038, 1045 (D.C.Cir.1980), we are persuaded that the Agency's decision not to use notice and comment procedures was consistent with congressional intent and reasonable under the circumstances.
 
 
 20
 C. This Court Lacks Jurisdiction to Consider EDF's Petition
 
 
 21
 EDF claims that the passage of section 3004(u) requires certain changes in the EPA groundwater monitoring regulations. Generally, these regulations are designed to determine if an owner or operator must take corrective action for a release of a contaminant from a regulated unit into the surrounding groundwater system. As currently written, these regulations require only that the background wells of monitoring systems "not be[ ] affected by leakage from a regulated unit." 40 C.F.R. Sec. 264.97(a)(1) (1986). EDF argues that, in light of the section 3004(u) duty to take corrective action for releases not only from regulated--i.e., hazardous waste--management units but also for releases from solid waste--i.e., non-regulated--management units, the groundwater monitoring procedures must be modified to enable the Agency to determine that groundwater is not being contaminated by either regulated or non-regulated units.
 
 
 22
 Whatever the merits of EDF's contention, its suit is not properly before us at this time. Our jurisdiction in these cases stems from section 7006(a)(1) of the Act, 42 U.S.C. Sec. 6976(a)(1) (1982), which grants exclusive jurisdiction to this court for "petition[s] for review of action of the Administrator in promulgating any regulation, or requirement under [the Act]." We also have jurisdiction to review any action of the EPA "denying any petition for the promulgation, amendment or repeal of a regulation under [the Act]." Id. EDF's claim is that the EPA should have promulgated a rule which, up until now, it has not promulgated. It cannot sensibly be seen as challenging the regulations actually promulgated in the Final Rule. The details of a groundwater monitoring program are a matter to be resolved through the use of the Agency's expertise in selecting the appropriate method of ascertaining compliance with statutory and regulatory norms. No specific method is mandated by the Act or by the 1984 Amendments. Indeed, EDF has petitioned the Agency to promulgate regulations implementing new groundwater monitoring procedures, but the EPA has not yet acted on its petition. See Request for Stay Pending Judicial Review or for Reconsideration, reprinted in Addendum A to Brief for the Respondent. When the Agency acts on the petition, either EDF can seek judicial review of the Agency's decision to deny its petition, or, if the Agency promulgates new regulations relating to groundwater monitoring, EDF might be able to seek judicial review of those regulations at that time. At this juncture, however, judicial review would be premature.
 
 
 23
 Of course, the Agency may not unreasonably delay in ruling on EDF's petition. Under our decision in Telecommunications Research & Action Center v. FCC, 750 F.2d 70 (D.C.Cir.1984), EDF may pursue an action in this court to compel the Agency to act on its petition. However, this is not the suit that EDF has brought before us, and we express no opinion on the merits of any such claim. At this point, we have no jurisdiction to entertain EDF's petition.
 
 III. THE MERITS
 
 24
 A. Interpretation of "Facility"
 
 
 25
 Section 3004(u) of the Act, 42 U.S.C. Sec. 6924(u) (Supp. III 1985), requires owners and operators to take "corrective action for all releases of hazardous waste or constituents from any solid waste management unit at a treatment, storage or disposal facility ... regardless of the time at which waste was placed in such unit." To implement section 3004(u) in its regulatory scheme, the EPA promulgated 40 C.F.R. Sec. 264.101 (1986), which provides in pertinent part that "[t]he owner or operator of a facility seeking a permit for the treatment, storage or disposal of hazardous waste must institute corrective action ... for all releases of hazardous waste or constituents from any solid waste management unit at the facility, regardless of time at which waste was placed in such unit." In its preamble to the Final Rule, the EPA stated that, based on its examination of congressional intent underlying section 3004(u), it would be interpreting the term "facility" as used in section 264.101 as "not limited to those portions of the owner's property at which units for the management of solid or hazardous waste are located, but rather extend[ing] to all contiguous property under the owner or operator's control." 50 Fed.Reg. at 28,712 (emphasis added).
 
 
 26
 The Industry Petitioners challenge this definition of "facility." They claim that the Agency's definition is incompatible with the plain language of section 3004(u) and is inconsistent with congressional intent. Alternatively, they contend that, in the absence of congressional intent to the contrary, the Agency is "bound" to employ the definition of "facility" it promulgated in 1980, codified at 40 C.F.R. Sec. 260.10 (1986). We disagree. We find that the plain language of section 3004(u) does not require the use of the Industry Petitioners' definition of facility. We also reject the claim that the EPA was somehow "bound" to employ its prior definition of facility. Employing standard tools of statutory construction, we find the EPA's definition of facility for purposes of section 264.101 to be consistent with section 3004(u) and with the congressional intent underlying the 1984 Amendments. Moreover, even if congressional intent were inconclusive on this point, we would uphold the Agency's interpretation as reasonably filling in gaps left by Congress when it enacted the 1984 Amendments.
 
 1. The Plain Language of Section 3004(u)
 
 27
 The Industry Petitioners first urge that the EPA's definition of "facility" is inconsistent with the directive in section 3004(u) to take corrective action "at a treatment, storage or disposal facility." They argue that the word "at" clearly shows an intent to limit the duty to take corrective action only to "contiguous land ... used for treating, storing, or disposing of hazardous waste." 40 C.F.R. Sec. 260.10 (1986). However, this would virtually nullify the requirement, to take corrective action for releases from any solid waste management unit. Under the Industry Petitioners' view, the only way a duty would attach to take corrective action for releases from a solid waste unit would be if that solid waste unit happened to be on the "contiguous land ... used for ... hazardous waste."
 
 
 28
 We fail to see how the use of the word "at" in section 3004(u) clarifies, in any way, the meaning to be placed on the word "facility." It certainly does not require the use of the Industry Petitioners' definition. Moreover, looking at section 3004(u) as a whole, it appears that employing the Industry Petitioners' definition would render the duty to take corrective action for releases from solid waste management units virtually meaningless. Absent some affirmative showing that Congress intended to achieve such an anomalous result, we are not persuaded that the EPA misconstrued the statutory language.
 
 2. Congressional Intent
 
 29
 The Agency argues that its interpretation of the word "facility" in this context, if not mandated by the plain wording of section 3004(u), is consistent with the congressional scheme underlying the 1984 Amendments. It notes first that the broad purpose underlying this aspect of the 1984 Amendments was to relieve future burdens on the "Superfund" program. See H.R.REP. NO. 198, 98th Cong., 1st Sess. 20, 61, reprinted in 1984 U.S. CODE CONG. & ADMIN.NEWS 5576, 5579, 5620 ("House Report"). As the House Report stated: "Unless all ... releases ... at permitted facilities are ... cleaned up ... many more sites will be added to the future burdens of the Superfund program.... The responsibility to control such releases lies with the facility owner and operator and should not be shifted to the Superfund program, particularly when a final permit has been requested by the facility." Id. at 61, reprinted in 1984 U.S. CODE CONG. & ADMIN.NEWS at 5620. The Agency also reasons that, since section 3004(v), 42 U.S.C. Sec. 6924(v) (Supp. III 1985), clearly employs a broader concept of a "facility" than does the section 260.10 definition, one can reasonably assume a similarly broad meaning of "facility" was intended in section 3004(u).
 
 
 30
 Section 3004(u) was enacted out of congressional concern "that current EPA regulations do not address all releases of hazardous constituents from solid waste management units at facilities receiving permits under section 3005(e). This could likely result in a situation of EPA issuing a final permit to a facility which is causing ground water contamination from inactive units, without the permit addressing that contamination in any way." House Report at 60, reprinted in 1984 U.S. CODE CONG. & ADMIN.NEWS at 5619; see also Conference Report at 92, reprinted in 1984 U.S. CODE CONG. & ADMIN.NEWS at 5663. Section 3004(u), in essence, creates the broad duty to take corrective action as a quid pro quo to obtaining a permit. Given this purpose, it appears that the EPA's construction of "facility" is fully consistent with congressional intent.
 
 
 31
 This view is further confirmed by section 3004(v), which requires an owner or operator to use best efforts to take corrective action "beyond the facility boundary." The provision is satisfied if the owner or operator is "unable to obtain the necessary permission to undertake such action." Clearly, "facility" is used in section 3004(v) to describe all of the property under the control of the owner or operator. We have no reason to assume that Congress intended a different meaning of facility in section 3004(u).
 
 
 32
 We can find no basis for overturning the EPA's interpretation of "facility" in this case. Indeed, even if we were "unable to discern congressional intent after employing traditional tools of statutory construction," UAW v. Brock, 816 F.2d at 765 n. 5 (D.C.Cir. April 24, 1987), we would still uphold the Agency's interpretation. It is clear to us that, to the extent there is " 'any gap left, implicitly or explicitly, by Congress,' " Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984) (quoting Morton v. Ruiz, 415 U.S. 199, 231, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270 (1974)), the Agency has acted to fill that gap in a way that is rational and not inconsistent with the 1984 Amendments. Accordingly, we "must respect the interpretation of the agency to which Congress has delegated the responsibility for administering the statutory program." INS v. Luz Marina Cardoza-Fonseca, --- U.S. ----, 107 S.Ct. 1207, 1222, 94 L.Ed.2d 434 (1987).
 
 
 33
 3. The Agency is not Required to Employ Its Prior Definition in Construing a New Congressional Enactment
 
 
 34
 The Industry Petitioners next contend that, in any event, i.e., without regard to the reasonableness of the EPA's current interpretation, the Agency is bound by its prior rulemaking to employ the initial definition of facility. This argument is wholly without merit.
 
 
 35
 The Industry Petitioners apparently have failed to recognize that the Agency has not "changed" its prior definition of facility; the EPA will continue to use the section 260.10 definition in construing other regulatory and statutory provisions under the RCRA. This case is thus unlike International Brotherhood of Electrical Workers, Local Union No. 474 v. NLRB, 814 F.2d 697, 712 n. 65 (D.C.Cir.1987), and Oil, Chemical & Atomic Workers International Union v. NLRB, 806 F.2d 269, 273-74 (D.C.Cir.1986), each of which involved a change in an agency's interpretation of a statutory provision. Even in those cases, however, the agencies were not "bound" to follow their prior views, but simply had to supply a justification for abandoning their prior positions. Here, the Agency has interpreted newly enacted statutory language, so it is hardly surprising that EPA officials did not feel constrained by the previously existing definition of facility. Furthermore, and most importantly, the EPA adequately explained its reasons for departing from the section 260.10 definition, thus making clear the reasonableness of its position. See 50 Fed.Reg. at 28,712.
 
 
 36
 4. The Agency Will Not be Exceeding its Authority
 
 
 37
 The Industry Petitioners fear that, as a result of the Agency's interpretation of facility, the EPA will be free to intrude into their production processes and those areas of their properties not used for the management of solid waste. However, by its terms, section 264.101 is limited to releases from solid waste management units. Indeed, in the preamble to the Final Rule, the EPA specifically addressed the Industry Petitioners' concerns. The Agency stated that it did not "believe that section 3004(u) applie[d] to spills that cannot be linked to solid waste management units. For example, a spill from a truck travelling through a facility would not constitute a release from a solid waste management unit." 50 Fed.Reg. at 28,713-14.
 
 
 38
 We fail to comprehend any legitimate basis for the Industry Petitioners' asserted fears. Nothing in section 264.101 as written, or as the Agency has stated that it will be applied, would result in the Agency exceeding its authority under the Act.
 
 
 39
 B. Applicability of Section 3004(o)(1)(A) to All Permits Granted After November 8, 1984
 
 
 40
 Section 3004(o )(1) of the Act, 42 U.S.C. Sec. 6924(o )(1) (Supp. III 1985), imposes certain technological requirements on owners or operators whose "application for a final determination regarding issuance of a permit under section [3005(c) ] is received after November 8, 1984." Despite this clear statutory language, the EPA announced that it would interpret 40 C.F.R. Secs. 265.221, 265.301 (1986), which implement section 3004(o )(1), to apply to all permits granted after November 8, 1984, rather than to applications for a final determination received after November 8, 1984. See 50 Fed.Reg. at 28,708 n. 7. In the face of clear statutory language, such as that contained in section 3004(o )(1), we cannot possibly uphold the Agency's position. "The principal charge of a court in statutory construction is to ascertain congressional intent. 'If a court ... ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.' " UAW v. Brock, 816 F.2d at 764 (D.C.Cir. Apr. 24, 1987) (quoting Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 2781 n. 9, 81 L.Ed.2d 694 (1984)). See also Burlington N.R.R. v. Oklahoma Tax Comm'n, --- U.S. ----, 107 S.Ct. 1855, 1860, 95 L.Ed.2d 404 (1987) ("Unless exceptional circumstances dictate otherwise, '[w]hen we find the terms of a statute unambiguous, judicial inquiry is complete.' " (quoting Rubin v. United States, 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981))). In the instant case, section 3004(o )(1) is absolutely clear, and it must be enforced according to its terms.[4]
 
 
 41
 C. Applicability of Section 264.101 to Fossil Fuel Combustion Wastes
 
 
 42
 EEI claims that 40 C.F.R. Sec. 264.101(a) (1986) appears to require owners and operators to take corrective action "for all releases of hazardous waste or constituents from any solid waste management unit at the facility," without explicitly exempting solid waste management units devoted to the handling of fossil fuel combustion wastes. It maintains that section 3001(b)(3)(A) of the Act, 42 U.S.C. Sec. 6921(b)(3)(A) (1982), specifically exempts fossil fuel combustion wastes from regulation under the Act, unless and until the procedures set forth in section 3001(b)(3)(C) of the Act, 42 U.S.C. Sec. 6921(b)(3)(C) (1982), are complied with. EEI argues that, because the section 3001(b)(3) exemption was not repealed by the 1984 Amendments, section 3004(u) cannot be seen as relieving the Agency of the obligation to perform the study required under section 3001(b)(3)(C) before placing fossil fuel combustion wastes within the regulatory scope of the Act. Because the Agency never conducted such a study, EEI contends that section 264.101(a) goes beyond the scope of the Act to the extent that it imposes a duty to take corrective action for releases from solid waste management units devoted to handling fossil fuel combustion wastes.
 
 
 43
 It is clear to us that, in formulating section 264.101(a), the Agency merely mirrored the language used in section 3004(u). At oral argument, the EPA maintained that it has taken no position as to whether section 264.101(a) applies to fossil fuel combustion wastes. Moreover, the Agency has assured us that it does not currently seek to take any enforcement actions with respect to releases from fossil fuel combustion waste management units. Accordingly, we find that EEI's claim is not yet ripe for adjudication. If and when the Agency takes a position with regard to the applicability of section 264.101(a) to fossil fuel combustion wastes, EEI or some other proper party may institute an appropriate action.
 
 IV. CONCLUSION
 
 44
 The various petitioners have raised a host of objections to the EPA's Final Rule. For the most part, we find these objections to be without merit. Certain other claims are not properly before us in this proceeding because they are not based on the Final Rule itself, but concern subsidiary matters on which the Agency has not yet acted or taken a position. We do find that 40 C.F.R. Secs. 265.221, 265.301 are invalid to the extent that they impose section 3004(o ) technological requirements on owners and operators whose applications for a final determination on their section 3005 permits were received before November 8, 1984.
 
 
 45
 So ordered.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. Sec. 294(d) (1982)
 
 
 [1]
 Under the Act, the term "solid waste" generally encompasses garbage, refuse, sludge or discarded material, excluding wastes contained in irrigation and domestic sewage systems and waste regulated by certain other statutory programs. 42 U.S.C. Sec. 6903(27) (1982). The term "hazardous waste" means a solid waste which may "cause, or significantly contribute to an increase in mortality or ... illness," or "pose a substantial ... hazard to human health or the environment when improperly ... managed." 42 U.S.C. Sec. 6903(5) (1982). Thus, although all hazardous wastes are solid wastes, not all solid wastes are hazardous wastes. The Agency has identified and listed hazardous wastes subject to regulation under the Act in 40 C.F.R. pt. 261 (1986)
 
 
 [2]
 The Motor Vehicle Manufacturers Association has also filed a petition for review
 
 
 [3]
 The Conference Committee Report stated:
 For those provisions of this Act which are immediately effective, it would be contrary to the public interest and impracticable for EPA to engage in the time-consuming rulemaking procedures required by Section A of the APA, 5 U.S.C. Section 553, to carry out swiftly it[s] statutory mandate. Therefore, for such immediately effective provisions, EPA appropriately may invoke the "good cause" exemption of 5 U.S.C. Section 553(b)(B) and (d)(3), in issuing final substantive or interpretative rules to implement those provisions. This will enable the Agency to put into place swiftly the enacted requirements.
 H.R.CONF.REP.NO. 1133, 98th Cong., 2d Sess. 112, reprinted in 1984 U.S.CODE CONG. & ADMIN.NEWS 5576, 5649, 5683 ("Conference Report"). Although the views of the Conference Committee alone might not be sufficient to satisfy the requirements of section 553(b)(B), we do find them to be an indication of congressional intent that is relevant to the section 553(b)(B) analysis. Cf. New Jersey v. EPA, 626 F.2d 1038, 1045 (D.C.Cir.1980) ("[J]udicial review of a rule promulgated under an exception to the APA's notice-and-comment requirement must be guided by Congress's expectation that such exceptions will be narrowly construed."). We thus cannot ignore a congressional expectation that notice and comment would be unnecessary in promulgating the Final Rule.
 
 
 [4]
 The Agency argues that section 3004(o ) as written is inconsistent with section 3015(b)(1) of the Act, 42 U.S.C. Sec. 6936(b)(1) (Supp. III 1985). Section 3015(b)(1) imposes section 3004(o ) requirements on interim status operators "with respect to each new unit, replacement of an existing unit, or lateral expansion of an existing unit that is within the waste management area identified in the permit application submitted under this section, and with respect to waste received beginning 6 months after November 8, 1984." 42 U.S.C. Sec. 6936(b)(1) (Supp. III 1985) (emphasis added). Section 3015 (b)(2), 42 U.S.C. Sec. 6936 (b)(2) (Supp. III 1985), in turn, requires the "filing ... of an application for a final determination regarding the issuance of a permit." Thus, section 3004(o ) requirements appear to attach only to interim status facilities that apply for a final determination under section 3015(b). Since such applications for a final determination will be received after the date of enactment of the Hazardous and Solid Waste Amendments of 1984, those facilities, as well as all interim status facilities that receive waste beginning six months after the effective date of the 1984 Amendments will be required to comply with section 3004(o ); others will not. We see no inconsistency between this and section 3004(o )